**UNITED STATES of America, Plaintiff,**

v.

**William A. MEANS, et al., Defendants.**

**William A. MEANS, et al., Plaintiffs,**

v.

**James R. MATHERS, et al., Defendants.**

**Nos. CIV 81–5131, CIV 81–5135.**

United States District Court,
D. South Dakota, W.D.

Dec. 9, 1985.

Larry Leventhal, Minneapolis, Minn., and Bruce Ellison, Rapid City, S.D., for the Indians.

Phil Hogen, U.S. Atty., Sioux Falls, S.D., and Reed Rasmussen, Asst. U.S. Atty., Rapid City, S.D., for the Government.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

DONALD E. O'BRIEN, Chief Judge.

This matter involves a controversy over whether or not the denial of a "special use permit" by the Forest Service was arbitrary and capricious. The Court finds that it was and that it has the effect of discriminating against Indians who were trying to practice their religion and the decision to deny was based on a clear error of judgment. The Forest Service is directed to again review this situation in conformance with this order.

## HISTORY OF THIS LITIGATION

On April 4, 1981, a group of people, mostly American Indians, gathered at Porcupine, South Dakota, a town located on the Pine Ridge Indian Reservation, and formed a caravan with the intention of traveling to and setting up a camp in the Black Hills National Forest. They established a campsite and it became known as Yellow Thunder Camp (YTC). The existence of YTC is the subject matter of this litigation.

On April 22, 1981, application was submitted on behalf of YTC members and the Lakota Nation for a special use permit to allow them to establish a religious, cultural and educational community on 800 acres of the Black Hills National Forest. Exhibit 1, p. 201. The application was revised on May 29, 1981. Exhibit 1, pp. 227–28, 233–59. The application was denied by the United States Forest Service through James Mathers, Forest Supervisor, Black Hills National Forest, on August 24, 1981, Exhibit 1, pp. 287–88, and he ordered the individuals occupying the YTC site to leave by September 8, 1981. Exhibit 1, pp. 281–82. On September 8, 1981, the members of YTC took a timely administrative appeal from the denial of the special use permit. Exhibit 0, Tabs 13, 14. The next day, September 9, 1981, the United States filed one of the instant cases, *United States v. William A. Means, et al.,* CIV 81–5131 (D.S. D.), against the named principals of YTC requesting an order declaring that the defendants were illegally occupying the 800-acre tract and directing them to vacate the site and rehabilitate it to its natural state. In turn, on September 15, 1981, William A. Means, Gregory F. Zephier, Sr., Ron Two Bulls and Russell Means, on behalf of YTC and the Lakota Nation, brought a separate action, *William A. Means, et al. v. James Mathers, et al.,* CIV 81–5135 (D.S.D.), against officials of the United States Forest Service contending that the order by James Mathers was illegal in that it violated the United States Constitution, the Indian Freedom of Religion Act, 42 U.S.C. § 1996, and the 1868 Fort Laramie Treaty. The complaint prayed for declaratory and injunctive relief. Each of these plaintiffs are members of the Lakota Nation[1] and are, or have been, residents of the YTC. Defendants in CIV 81–5135 are officials of the United States Forest Service or the United States Department of Agriculture. James Mathers is Forest Supervisor, Black Hills National Forest, United States Forest Service. Defendant Craig Rupp is Regional Forester, Rocky Mountain Region, United States Forest Service. R. Max Peterson is Chief of the United States Forest Ser-

1. While there is no precise definition for the Sioux Nation and Lakota Nation which applies in all contexts, as a general matter, the Sioux Nation includes the Lakota, Dakota and Nakota people. Vol. X, pp. 141–144. Oglala Sioux is a subdivision of the Lakota Nation. Vol. X, p. 143; Vol. XVIII, pp. 171–72.

vice. John Block is the United States Secretary of Agriculture.

Both sides moved for consolidation of the two actions and on December 7, 1981 the Court ordered the matters consolidated for trial.

After the actions were filed, the first hearing held by this Court was on October 5, 1981, in Pierre, South Dakota and pertained to Means' and others' motion for a preliminary injunction which sought to prevent the forcible removal of the members of YTC from the Black Hills National Forest. The concerns of Means and others were resolved by the parties and a Stipulation, Docket No. 19 in *Means v. Mathers,* CIV 81–5135, was entered which provided that the United States would not take forcible physical action designed to terminate YTC without first securing a court order.

A few days after that hearing, specifically on October 9, 1981, the administrative appeal taken from the denial of the special use permit was to be heard. However, on October 7, 1981, YTC was notified that the hearing would be stayed because of these lawsuits pending in federal district court. The Forest Service took the position that 36 C.F.R. § 211.19(b)(3) precluded administrative appeal of issues being litigated in federal district court and that the denial of the special use permit was such an issue. Means and others took the position that the administrative appeals procedure should not be stayed and filed a motion for preliminary injunction requesting this Court to declare that the Forest Service must keep its administrative appeal procedure open to them. This controversy and the dispute over the construction of a geodesic dome at the YTC site were heard by the Court in Pierre, South Dakota on December 4, 1981. In an order filed December 14, 1981, the Court denied the United States' Amended Motion for Preliminary Injunction and partially granted the motion for preliminary injunction by YTC members in that a temporary geodesic dome was allowed to be constructed. In addition, the Court denied

the request by YTC to order the resumption of the administrative appeal process in regard to the special use permits.

Trial was commenced on November 22, 1982, and proceeded until the conclusion of the Government's case two weeks later. At that point the trial proceedings were recessed pending the outcome of the appeal from this Court's order of November 23, 1982 directing the United States Marshals Service to pay witness fees and costs of YTC's witnesses. On December 29, 1983, a panel for the Eighth Circuit Court of Appeals affirmed that order. *United States Marshals Service v. Means,* 724 F.2d 642 (8th Cir.1984). The Marshals Service's motion for rehearing was granted and on August 14, 1984, the Eighth Circuit, sitting en banc, concluded "that the district court may order government advancement of such fees and expenses," *United States Marshals Service v. Means,* 741 F.2d 1053, 1055 (8th Cir.1984) (en banc), and remanded the case to this Court for further proceedings consistent with its opinion.

During the afternoon of January 22, 1985, this Court held a hearing in the nature of a pretrial conference in Sioux Falls, South Dakota. The presentation of Means' and others' case began on Monday, January 28, 1985 in Deadwood, South Dakota and proceeded over nine days. On May 9, 1985, the Government presented its rebuttal case in Rapid City, South Dakota. The next day surrebuttal was presented, the taking of testimony concluded, and closing arguments presented. The parties have filed their proposed findings of fact and conclusions of law and have commented in letters to the Court on the other side's proposals. The matter is fully submitted and, pursuant to Fed.R.Civ.P. 52, the Court enters this as its findings of fact and conclusions of law.

### FINDINGS OF FACT [2]

1. The parties agree and the Court finds that this case does not concern own-

---

**2.** The findings set forth under this heading are not exclusive. Additional findings will be made

as needed in the *Discussion* portion of this decision.

ership of the Black Hills or even the 800-acre tract referred to in the special use permit application. The claims to the Black Hills under the Fort Laramie Treaty have been litigated—culminating in the case of *United States v. Sioux Nation of Indians,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980). Instead, the present litigation concerns the right to usage of the 800 acres of land designated in the special use permit application of Means and others.

2. Purpose of YTC. The purpose behind forming YTC has been different for different individuals and has changed for some individuals over time. For a few, the initial purpose of establishing YTC was to begin reacquiring the Black Hills piece by piece. However, the dominant purpose of YTC is to provide a site for the pursuit of the traditional Lakota spirituality, culture and community life within the sacred environment of the Black Hills. Vol. XI, pp. 183–84.

3. Victoria Creek runs through the 800-acre tract. The tents and structures currently at YTC are located close to Victoria Creek and Victoria Lake. Victoria Lake was formed when Victoria Dam was constructed on the creek in 1939. Most of the dam was removed in 1978 after being severely weakened in a flood in 1972. What remains of the dam holds a small reservoir of about 0.2 acres. Exhibit 1, p. 310. This reservoir is more accurately described as a small pond rather than a lake.

4. Exclusive Use—Gate. The Government asserts that Means and others have sought to gain *exclusive* use of the 800-acre tract. Means and others assert that their purpose is not to exclude others for the sake of exclusiveness, but to protect the safety of those in the camp and to prevent the disruption of ceremonies.

The Court finds that YTC established a security gate and guard shack on the road leading to the camp proper. Before erecting the gate, a post with an arm that could be raised and lowered by rope, the members of YTC consulted James C. Whittekiend, who was at that time Pactola district ranger for the Black Hills National Forest.

Mr. Whittekiend indicated that the Forest Service would make no objection "to the gate right at the camp where it is now." Vol. V, p. 133; Vol. X, p. 111. The gate was established for safety reasons. Vol. XI, p. 17; Vol. X, p. 111. First, the gate prevented vehicles from being driven through the camp too fast. Vol. XI, p. 17. Second, individuals who had been drinking and came to the gate were asked not to enter. *Id.;* Vol. XI, p. 186. Third, individuals with firearms who elected not to disarm themselves were not allowed in the camp. Vol. X, p. 133. The concern about having unknown people in the camp while they were carrying firearms was real to the campers and justified in their eyes in light of the gunfire they heard near the camp, and the appearance and weaponry of persons claiming to be turkey hunters, Vol. XI, p. 13. The members of YTC have not enforced their use of the 800-acre tract as exclusive. Almost all of the people stopped at the gate were allowed to come into the camp and could observe the ceremonies being held. Vol. XI, p. 18.

5. Decrease in Public Use. The establishment of YTC caused a decrease in the number of non-Indians making use of the 800-acre tract for recreational types of activities. The Forest Service roughly estimates the area to have been used for 6000 visits per year, or about 16 people per day. Exhibit 1, p. 312. These uses included picnicing, fishing, hunting, target practicing, and off-road and on-road vehicle travel. The evidence does not establish that the opportunities for such uses in the Black Hills have been noticeably diminished nor does the evidence establish that the actual enjoyment of such uses in the Black Hills has been diminished by 6000 visits per year or has been diminished at all. Rather, the potential harm that YTC poses to recreationalists is that they are not as able to do those activities *in the 800-acre tract.* The Court finds that the 800-acre tract is not unique from the recreationalist's point of view compared to the rest of the Black Hills and, thus, the recreationalist is not harmed by conducting activities elsewhere

in the vast Black Hills than the 800-acre tract.

The number of "visits" per year to the area has increased since the establishment of Yellow Thunder Camp. The evidence establishes that at least twelve individuals are living in the camp on a year-around basis. In addition, many people, both Indian and non-Indian, visit YTC for varying lengths of time. Thus, while the type of use has changed, the amount of use of the 800 acres has increased. With respect to whether "public use" of the area has increased or decreased, the Government has failed to establish that it decreased and Means and others have failed to establish that "public use" increased. It is clear, however, that the change in use has created another type of "public use" other than the recreational uses listed above; specifically, interested persons are able to observe in a nondisruptive way Indian ceremonies which do not require absolute solitude. This adds to the diversity of uses available in the Black Hills National Forest.

6. The area known as the Black Hills, or "Paha Sapa" to the Lakota, is central and indispensable to the religion of the Lakota. The Government conceded in mid-trial that the Black Hills are regarded as a sacred area to those practicing the Lakota religion today. Vol. XVIII, pp. 2–3. Indeed, Mathers testified, "I found the Lakotas do consider the Black Hills to be sacred, I can't explain why my attorneys are saying that this is only a recent position of the Lakotas." Vol. XVII, pp. 127–28. The Black Hills are the setting for their creation stories, Vol. X, p. 76–77, and Lakota legend indicates that the Black Hills are the oldest place on earth. Vol. XII, p. 31, Testimony of Charlotte Black Elk. The Seven Sacred Ceremonies of the Lakota people all have a relationship to some point in the Black Hills. Vol. X, p. 45. Many legends of the Lakota are used to explain particular geological phenomenon that exist in the Black Hills.

Before the white man came, the nomadic Lakota would travel to the Black Hills to conduct religious ceremonies which were basic or fundamental to the practice of their religion. Access to the Black Hills is critically important to the meaningful and fulfilling practice of the Lakota religion. Also, the idea of the Black Hills provides a foundation for many of the beliefs of the Lakota religion.

In general, religion can be practiced at different levels of devotion and seriousness. The same is true of the Lakota religion. For the more devout Lakota practitioners, such as many of those who testified for Yellow Thunder Camp, the religion pervades and impacts upon nearly all of the facets of their daily lives. This impact is not so much the specific regulation experienced by the Amish in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); rather, the evidence shows the impact to be more the application by the practitioner of fundamental principles to day-to-day situations. In that sense, the Lakota religion touches the entire way of life of the practitioner.

With respect to the practice of conducting religious ceremonies in the Black Hills, the Court finds that this practice is rooted in the religious conviction and is not a matter of personal or philosophical preference.

A dispute exists over how long the area has been regarded as sacred. The exact date, decade or century when this belief arose is not clear. However, the Court finds that the belief that the Black Hills are sacred predates the arrival of the white man into the area and is at least, but probably more than, three centuries old. This finding is supported by the names that the Lakota gave certain locations within the Black Hills and the fact that these names were in existence when the French first had contact with the Lakota. The Black Hills is the only place where the names for geographic areas and sites are tied to the Lakota religion. Vol. XII, p. 48. Also, the legends and oral history of the Lakota support this finding. Furthermore, in the 1868 Fort Laramie Treaty, the Sioux Nation insisted on protections for the Black

Hills area, which indicates its importance at that point in time. The Court does not believe it is crucial to any issue here whether the Black Hills has been a sacred area for 117 years, i.e., back to the Fort Laramie Treaty, or whether it was 217 or 417 years.

The finding regarding length of use and of importance is not undermined by the lack of archeological evidence of the Lakota in the Black Hills. The Lakota were nomadic; they followed the buffalo and traveled with few material possessions. As a result, large archeological sites are not expected to be found because archeologists have tended to devote their energies to larger non-Lakota sites with more artifacts rather than conduct the more tedious study of smaller sites, for example, one or two teepee rings, that contain few artifacts. Therefore, at this point in time, it is not surprising that archeologists have not been able to reconstruct the very early use of the Black Hills by the Lakota. Vol. XIII, pp. 103–04.

YTC Site. The site of YTC did not have specific religious significance prior to the time it was chosen for the establishment of YTC. The site for YTC was chosen by consensus of Lakota elders as one which was conducive to religious practices. YTC was established on the fourth day of the fourth month; that day was chosen because four is regarded as a sacred number to the Lakota. The fact that the site for YTC was chosen by the elders with spiritual purposes in mind causes the specific site to have religious significance, but that significance is not the product of long-standing tradition.

Religious practices conducted at YTC include sweats, pipe ceremonies, fasting, vision quest, and the Sundance.[3]

7. Religious Practices Impaired. Determining the real-world impact that the Forest Service's control and regulation of the Black Hills has had on the Lakota religion is complicated by the fact that many aspects of the Lakota religion were outlawed as far back as the 1880s.[4] Thus, the practice of the traditional Lakota religion has been inhibited, which makes it more difficult to learn about today. An additional complicating factor is that some knowledge about the Lakota religion is considered "sacred knowledge" and is not revealed to persons who have not gone through certain ceremonies. Vol. XII, p. 54.

Forest Service restrictions on Indian religious practices can be placed in three categories: (1) Restrictions on location; (2) Restrictions on the manner in which the ceremony is conducted; and (3) Fees charged. These types of restrictions impact upon the practice of religion in one of four ways. First, the restrictions can be ignored, the ceremony conducted without notice to or approval from the Forest Service, and the practitioner thereby runs the risk of being arrested for violating the law. Some Indian practitioners have taken this path. Second, the practitioner can decide that the restrictions decrease the spiritual value of the ceremony to the degree that it is not worth performing and, thus, the ceremony is not performed. This course has been followed also. Third, the practitioner can conduct the ceremony in spite of the difficulties imposed by the restrictions and hope that no sacred laws are violated. Fourth, the ceremony can be performed without practical difficulties resulting from the restrictions. Both of these latter two situations have occurred.

Location restrictions. Some religious ceremonies and practices do not have the

---

**3.** "Sweats" are conducted in a sweat lodge and are akin to a sauna bath by use of heated rocks and steam. A "Vision Quest" is a ceremony involving fasting, praying and a calling to a supreme being to direct the seeker by a vision. A Sundance is a renewal ceremony, one of the Seven Sacred Ceremonies, and requires a sweat lodge and an open fire, among other things.

**4.** Many Indian religious ceremonies were banned for many years. One account claimed it was from 1881 to 1934. Congress did not ban with a statute. It was done administratively by the Commissioner of Indian Affairs. (American Indian Religious Freedom Act Report (Department of the Interior, 1979), pp. 5–6). Apparently the Army enforced the edict. Vols. XV, pp. 239–42; XVI, pp. 2–4.

performance site set in a particular location by the tenets of the Lakota religion. However, the site for certain ceremonies is chosen by an individual or group acting with a sincere belief that the choice being made is aided by spiritual guidance. *E.g.*, Vol. XVIII, p. 101. Once the site is chosen, it is religiously significant to the practice of that particular ceremony. In addition, there was testimony that the choice of a site is sometimes reinforced by the occurrence of natural phenomenon after the choice has been made. For example, participants involved testified that the day YTC was established the site experienced a wide variety of weather, i.e., "the four seasons" (rain, snow, sleet and sunshine), the appearance of a cloud shaped like an eagle, and a unique display of the northern lights occurred that night. Vol. XVIII, pp. 106–07. At times, the Forest Service has refused to issue permits for ceremonies in the spot chosen by the individual but has offered alternative sites. Vol. XII, p. 66–67. The alternatives offered usually do not take into account the subjective criteria, i.e., spiritual signs such as the appearance of an eagle or the trembling of the earth, that goes into the Indians' selection of a ceremonial site.

Other Forest Service requirements have an effect on both the location and manner in which the ceremony is conducted. Portions of some ceremonies are subject to restrictions such that the different parts of the ceremony must be performed in areas that are distant from the other locations being used. For example, restrictions on where fires are permitted and, thus, where sweat lodges may be maintained can cause participants who must walk barefoot from the sweat lodge from the place of fasting to traverse five to nine miles of rocky ground. Also, the Forest Service does not allow the traditional practice of taking stones from Inyan Kara Mountain for use in the Sundance at Devil's Tower even though the rocks would be brought back after the ceremony. Devil's Tower is the traditional place where the Sundance, the ceremony of renewal and one of the Seven Sacred Ceremonies, was held. In other words, that is the place where the Sundance would be held in order to obtain the highest level of spiritual significance.

The restrictions referred to in the above two paragraphs are not merely inconveniences preliminary to the ceremony, but interfere with or negatively impact upon the manner in which the ceremony itself is conducted.

Where a ceremony requires an overnight stay in the Black Hills, such as a vision quest that starts and ends with a "sweat," the adherent may be required to pay a camping fee. In the case of Charlotte Black Elk, she paid a $25.00 camping fee in order to have a sweat lodge at a campsite the location of which was specified by the Forest Service. A sweat lodge is necessary in conducting a Vision Quest ceremony.

Finally, religious ceremonies have been disturbed by tourists, a problem specifically referenced in the Legislative History of the American Indian Religious Freedom Act. The nature of certain ceremonies requires solitude to allow for concentration and uninterrupted meditation. The Forest Service has adopted the position that it will not exclude tourists from an area that is being used by Indians for religious purposes. Indians are allowed to form a perimeter around the site and request tourists not to enter the area. In effect, the Indians must rely on the good will of the tourists if they are to have the needed solitude. The result is that the value of an ongoing Indian religious ceremony to its participant(s) is subject to being destroyed at any time by those using the national forest for recreational purposes.

8. Why not private land? There are numerous parcels of privately owned land within the Black Hills National Forest. Many private parcels are equal or greater in size than the 800-acre tract covered in the special use permit application. There are 295,000 acres of privately owned land in the Black Hills National Forest, held in 8,000 separate parcels. Vol. V, p. 208. There are 1,523,000 acres of land in the

Black Hills. Vol. XIX, p. 209.[5] If the YTC use permit were granted for the full 800 acres requested, it would represent .00052% of the total land in the Black Hills National Forest. The Forest Service has maintained that one reason for denying the special use permit, both Alternative Two and Alternative Three, was that private land was available to Means and others. This position presupposes that they have money to buy suitable land and that it conforms to what they need, has religious significance, and that the owner would actually sell to them.

First, the applicant group does not have the economic resources to purchase or rent suitable lands outside the National Forest. This fact was not considered by the Forest Service in denying the special use permit. Also, the money awarded to the Sioux Nation as just compensation for the taking of the Black Hills is not available to the applicant group so it is not within their power to decide to "buy back" a portion of the Black Hills.[6] Second, whether such private parcels were acceptable from the spiritual perspective was not considered by the Forest Service. The evidence does not show that a spiritually acceptable private parcel was available for sale or lease. Of the 8,000 private parcels, the largest majority are single-family cabins which would not be suitable by reason of size alone. Finally, if the applicants here had the money, which they do not, and could find a parcel that fit their needs, the evidence here demonstrates that their chances of finding someone willing to sell to them are remote. *See* Kyle report, Ex. 87, p. 1, and Vol. V, p. 156.

## LEGAL PRINCIPLES

I. Administrative Procedure Act.

A. Section 706.

Section 706, Title 5, is entitled "Scope of Review" and provides:

5. Over 2,400 square miles. Vol. VI, p. 135.

6. In *United States v. Sioux Nation of Indians,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844, the Supreme Court affirmed a Court of Claims award of $17.1 million with interest from 1887,

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the Court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

B. *De Novo* Review Under *Overton Park.*

Under § 706(2)(F) as explained in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *de novo* review is proper in certain cases. In *Overton Park,* the Supreme Court stated the following as a general proposition:

a sum which is now estimated to be over 200 million dollars, to the Sioux Nation. While this money is presumably available, this Court has been led to believe it will never be accepted.

De novo review of whether the Secretary's decision was "unwarranted by the facts" is authorized by § 706(2)(F) in only two situations. First, such de novo review is authorized when the action is adjudicatory in nature and the agency factfinding procedures are inadequate. And, there may be independent judicial factfinding when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action. H.R.Rep. No. 1980, 79th Cong., 2d Sess.

401 U.S. at 415, 91 S.Ct. at 823.

### C. Legal Questions.

■ The standard of review of factual findings is the subject of much dispute in this case and will be discussed below. However, in reviewing an agency's decision for legal errors, the standard to be applied is straightfoward. A court reviewing questions of law which do not involve the expertise of an agency is not limited to the arbitrary and capricious standard; rather, it can determine such questions anew without deference to the agency's conclusions. *First National Bank in Sioux Falls v. National Bank of South Dakota*, 667 F.2d 708, 711 (8th Cir.1981).

### D. Constitutional Questions.

Section 706(2)(B) directs courts to set aside any agency action which is contrary to constitutional right. The Fifth Circuit interpreted this section as follows:

The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making. Whereas § 706(2) authorizes reviewing courts to overturn agency findings and actions involving *nonconstitutional* claims only when the agency has abused its discretion, § 706(2)(A), acted arbitrarily and capriciously, § 706(2)(A), or made findings unsupported by substantial evidence, § 706(2)(E), section 706(2)(B) explicitly authorizes the court to set aside any agency action "contrary to constitutional right...." [Independent judicial judgment is especially appropriate in the First Amendment area. Judicial deference to agency fact-finding and decision-making is generally premised on the existence of agency expertise in a particular specialized or technical area. But in general, courts, not agencies, are expert on the First Amendment.]

\*    \*    \*    \*    \*    \*

Moreover, Porter would of course have a right to sue directly under the Constitution to enjoin her supervisors and other federal officials from violating her constitutional rights. *See, e.g., Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). In that case there would be no statutory reason for the court to defer to agency findings or rulings. Whether Porter sues directly under the Constitution to enjoin agency action, or instead asks a federal court to "set aside" the agency actions as "contrary to [her] constitutional right[s]" under § 706(2)(B), the role of the district court is the same.

*Porter v. Califano*, 592 F.2d 770, 780–81 (5th Cir.1979). Thus, on issues involving the Constitution, this Court need not defer to the Forest Service's findings or rulings. This appears to be the approach taken by the court in *Northwest Indian Cemetery Protective Ass'n v. Peterson*, 565 F.Supp. 586 (N.D.Cal.1983).

### II. First Amendment.

Freedom of religion is guaranteed by the First Amendment, which provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." However, this guarantee is not absolute in all respects.

Thus, the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in

attaining a permissible end, unduly to infringe the protected freedom.

*Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). In the instant case the primary focus is on conduct, although the Court recognizes that the belief/action distinction is not always clean or helpful. *Wisconsin v. Yoder,* 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972); L. Tribe, *American Constitutional Law,* § 14–9, at 837–38 (1978).

From a broad perspective, this case could be viewed as involving freedom of expression in a public place. As a general rule

> [t]he right to use a public place for expressive activity may be restricted only for weighty reasons.
>
> Clearly, government has no power to restrict such activity because of its message. Our cases make equally clear, however, that reasonable "time, place and manner" regulations may be necessary to further significant governmental interests, and are permitted.

*Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972). In addition, the Supreme Court has recognized:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thought between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). This principle was made applicable to the use of such public places when the First Amendment activity was expressing religious views and holding religious meetings. *Kunz v. New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); *O'Hair v. Andrus,* 613 F.2d 931, 934–35 (D.C.Cir.1979).

More narrowly, this case could be viewed as an Indian free exercise case concerning the use of public lands. The Supreme Court has yet to address such an Indian case; lower courts have. *Wilson v. Block,* 708 F.2d 735 (D.C.Cir.1983), *cert. denied,* 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983); *Badoni v. Higginson,* 638 F.2d 172 (10th Cir.1980), *cert. denied,* 452 U.S. 954, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981); *Sequoyah v. Tennessee Valley Authority,* 620 F.2d 1159 (6th Cir.1980), *cert. denied,* 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980); *Northwest Indian Cemetery Protective Ass'n v. Peterson,* 565 F.Supp. 586 (N.D.Cal.1983); *Northwest Indian Cemetery Protective Ass'n v. Peterson,* 552 F.Supp. 951 (N.D.Cal.1982) (order denying preliminary injunction); *Inupiat Community of Arctic Slope v. United States,* 548 F.Supp. 182 (D.Alaska 1982); *Crow v. Gullet,* 541 F.Supp. 785 (D.S.D.1982), *aff'd,* 706 F.2d 856 (8th Cir.), *cert. denied,* 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983). *See generally,* Comment, *Indian Worship v. Government Development: A New Breed of Religion Cases,* 1984 Utah L.Rev. 313. (The instant case involves only Indian access; no government development problem exists).

■ Generally, Indian free exercise claims are subject to the usual two-step balancing analysis. First, plaintiffs must establish that the Government action burdens the exercise of their religion. Second, where a burden is shown, the Government must establish that its action "is the least restrictive means of achieving a compelling state interest." *Quaring v. Peterson,* 728 F.2d 1121, 1126 (8th Cir.1984) (driver's license photo requirement unconstitutionally impinged on plaintiff's religious beliefs).

■ Government regulation can affect both where and how a religious ceremony is performed. This presents the classic First Amendment problem of whether there is a denial of the free exercise of religion when a government regulation, whose purpose is concededly nonreligious, either makes illegal, or otherwise burdens, conduct which is dictated by some religious belief.

A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion. *Wisconsin v. Yoder*, 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972); *Windsor Park Baptist Church v. Arkansas Activities Ass'n*, 658 F.2d 618, 621 (8th Cir.1981). *See Walsh v. Louisiana High School Athletic Ass'n*, 616 F.2d 152, 157 (5th Cir.1980). *E.E.O.C. v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1279 (9th Cir.1982). Where the effect of a law is to impede the observance of a religion, that law may be invalid even though the burden is characterized as indirect. *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). Nevertheless, a regulation is not invalid simply because it affects the operation of a religious organization. *E.E.O.C. v. Pacific Press Publishing Ass'n*, *supra*. When deciding whether a neutrally based rule violates the free exercise clause, three factors must be weighed: (1) the magnitude of the rule's impact upon the exercise of the religious belief, (2) the existence of a compelling governmental interest justifying the burden imposed upon such exercise, and (3) the extent to which recognizing an exemption from the rule would impede the governmental objectives sought to be advanced. *E.E.O.C. v. Pacific Press Publishing Ass'n*, *supra*.

A. Burden.

1. *Sincere Religious Belief.* Initially, claimants must establish that the conduct in question is based on a religious belief which is sincerely held. *Wisconsin v. Yoder*, 406 U.S. at 215, 92 S.Ct. at 1533; *United States v. Ballard*, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944). After establishing that the claim is based on a sincerely held religious belief, the next step is to show that the land is central or indispensable to a religious practice.

2. *Central—Indispensable.* In the context of Indian access to religious sites, the Sixth Circuit held that, to establish a "burden," the plaintiffs first had to prove that

the land to be flooded by the dam project was indispensable or central to their ceremonies or practices. *Sequoyah v. Tennessee Valley Authority*, 620 F.2d at 1164. Similarly, the District of Columbia Circuit held

that plaintiffs seeking to restrict government land use in the name of religious freedom must, at a minimum, demonstrate that the government's proposed land use would impair a religious practice that could not be performed at any other site.

*Wilson v. Block*, 708 F.2d at 744.

3. *Burden in Fact.* If the centrality requirement is met, the next issue is whether the Forest Service has burdened or impeded the exercise of the Lakota religion through its restrictions on use of and access to the Black Hills.

The Supreme Court has not set forth a precise test for determining whether or not a burden exists. To answer this question, a court or agency must take a sensible and realistic look at the facts and circumstances of the case and then decide whether there exists a real negative impact upon the exercise of the religion that is significant enough to be labeled a burden.

A survey of the Indian religion case law reveals that in *Wilson v. Block* the facts were that

[t]he Forest Service, however, has not denied the plaintiffs access to the Peaks, but instead permits them free entry onto the Peaks and does not interfere with their ceremonies or the collection of ceremonial objects.

*Wilson v. Block*, 708 F.2d at 744. Thus, the facts in that case did not show a burden. Similarly, in *Crow v. Gullet*, the court, in holding that the registration and camping permit requirements did not burden plaintiffs' religious exercises in the area of Bear Butte, stated:

Plaintiffs did not allege that the permit requirements restricted plaintiffs' access to the Butte or to ceremonial sites. Nor did they allege that any such permit was requested and denied. Plaintiffs simply

object to the requirement of permits and registration at a place so deeply rooted in their religious tradition. ... The requirements do not require plaintiffs to violate any tenet of their religion, but serve valid state interests in controlling traffic at the park and in providing the means to contact visitors in the case of an emergency.

*Crow v. Gullet,* 541 F.Supp. at 793. Also, in *Badoni v. Higginson,* plaintiffs requested access to Rainbow Bridge on infrequent occasions to conduct religious ceremonies in private. The court stated that this concern could be met by applying for a public assembly permit which would grant access after normal visiting hours and, thereby, assure privacy. Since the plaintiffs in *Badoni v. Higginson* made no allegation that any such permit had been requested and denied, the court ruled that their free exercise rights had not been infringed.

In the only case which the Indians have won, *Northwest Indian Cemetery Protective Ass'n v. Peterson,* 565 F.Supp. 586, 594 (N.D.Cal.1983), the court found that the development project would seriously impair the Yurok, Karoh, and Tolowa tribes' use of the high country for religious practices. The high country was the center of their spiritual world, was essential to performing ceremonies which constitute the heart of their religious beliefs, and was used to train young persons in traditional ceremonies and beliefs so that such practices would be preserved and conveyed to future generations. Finally, the court found that harvesting of timber and construction in the high country would seriously damage the qualities which made possible communication with the "great creator" there. As a result, the court found that the exercise of the Indians' religion would be unduly burdened and permanently enjoined the development project. The practical experience of the courts in these Indian cases is helpful in guiding this Court's analysis of whether a burden exists in this case.

## DISCUSSION

In their original complaint filed September 9, 1981, Means and others contended that the order directing them to leave YTC was unlawful because "it violate[d] numerous provisions of the United States Constitution, the Indian Freedom of Religion Act (42 U.S.C. 1996), and the 1868 Ft. Laramie Treaty between the Sioux Nation and the U.S. Government." Also before the Court is the question of whether the denial of the special use permit application violated the Administrative Procedure Act.

The parties agree that the issue of whether Forest Supervisor Mathers' denial of the permit was legal and proper is before the Court. In its Order filed December 14, 1981 (Docket No. 24, CIV 81–5131), this Court found that the issue of the special use permit was squarely before the Court. In other words, this Court "assumed jurisdiction over the pending administrative appeal and agreed to consider it with the consolidated cases." *United States Marshals Service v. Means,* 724 F.2d 642, 644 (8th Cir.1983).

The administrative record in this case is compiled in Exhibit 1. In a letter dated August 24, 1981, Mathers denied the applications for special use permits. Ex. 1, pp. 281–82. Mathers signed the Decision Notice also on August 24, 1981. Ex. 1, pp. 287–88. The Environmental Assessment which evaluates the applications and alternatives is set forth on pages 289–323 of Exhibit 1.

The Forest Service considered three alternatives in evaluating the applications. (Ex. 1, p. 314). Alternative One was the denial of the special use applications or the "no-action" alternative. Alternative Two involved granting the applications as submitted and allowing the construction of improvements and the exclusive use of the 800 acres. Alternative Three provided for the approval of a renewable annual special use permit for exclusive use of up to 800 acres with no permanent structures allowed.

The Forest Service stated its reasons for rejecting Alternatives Two and Three as follows:

1. Real doubt that permanent buildings or permanent occupancy of the Black Hills are central or essential to the practice of Indian religion. Ex. 1, p. 317.

2. Temporary access for religious purposes would be available, within existing laws and policies, if the applications were denied. Ex. 1, p. 317.

3. Neither the Fort Larramie Treaty of 1868 nor the American Indian Religious Freedom Act provided applicants with any ownership or priority rights in the Black Hills National Forest.

4. The Alternatives would directly conflict with existing public timber, range, and recreational uses.

5. Private land within the Black Hills that is apparently, if not more, suitable for applicants' use is available for purchase.

6. Forest Service policy deems permanent, exclusive uses undesirable.

7. Applicants did not demonstrate the financial capability to carry out the project, a relevant criteria under 36 C.F.R. § 251.

8. A developed community would create new demands on public services provided from the surrounding community.

9. Several private landowners in the area believed their property values would be reduced.

10. Timber harvesting activities and related road construction on the 800 acres would be adversely impacted.

11. Grazing capacity would be reduced.

12. Buildings, roads and septic systems to serve applicants' needs may cause erosion and pollution problems.

13. A community of 500 people would dislocate many wildlife species.

14. Recreational use of the area would be denied the public and conflicts between community residents and other members of the public might result.

The Environmental Assessment states:

In summary, the proposal would conflict with the Forest Service special use policy, is not compatible with existing or planned multi-use management activities, would create many short and long term environmental impacts, and would provide primarily for private interests. Denial of the applications based on the above would not create a significant burden on the exercise of the applicant's religion. (Ex. 1, p. 322.)

I. Legal Errors in Agency Decision.

■ Three major errors of law exist in the reasoning applied by the Forest Service to Means' and others' free exercise claim. *First*, the Forest Service applied the following standards to the free exercise claim: (See Ex. 1, p. 289.)

(1) It must be determined whether the governmental action creates a burden on the exercise of the applicant's religion. The "burden" is further determined as follows:

(a) whether the claim is grounded on a sincerely held religious belief, and

(b) whether the affected practice is central or central to the religion.

(2) If a burden is found, it must be balanced against the governmental interest, with the government showing an overriding or compelling reason for its action.

The second prong of the test applied to determine whether a "burden" existed is legally erroneous. In *Wilson v. Block*, 708 F.2d 735, 743 (D.C.Cir.1983), the Court effectively cautioned against the entanglement with religious doctrine which would result if one focused upon the importance of the particular practice to the religion.

We agree that the First Amendment protection of religion "does not turn on the theological importance of the disputed activity," (cites omitted) and that courts may not "dictate which practices are or

are not required in a particular religion" (cites omitted).

The only "practice" scrutinized by the Forest Service under the erroneous legal standard was the permanent occupancy of the Black Hills. Ex. 1, pp. 316–17. The Forest Service decided that actual occupancy of the Black Hills on a permanent basis was not an essential aspect of the Lakota religion. Furthermore, the administrative record strongly implies that the Forest Service decided that the YTC site was not an essential site to the Lakota religion, although no mention is made of practices conducted at the site, other than occupancy.

To correctly address the free exercise claim, the Forest Service should have asked the following questions:

1. Is the idea that the Black Hills are sacred a sincerely held religious belief?

2(a). If yes to No. 1, is the Black Hills central or indispensable to the performance of particular religious practices?

  (b). If yes to No. 1, is the YTC site central or indispensable to the performance of particular religious practices?

3(a). If yes to No. 2(a) and YTC is not central, do the Lakota have access to other areas and is their conduct in those areas sufficiently free from regulation so that their religious practices are not burdened?

  (b). If YTC is central, do the Lakota have access to the site and is their conduct in performing their religious practices sufficiently free from government regulation. so as not to be burdened?

4. If there is a burden under 3(a) or (b), is there a compelling government interest which overbalances the burden?

5. Finally, if there is such a compelling government interest, is it served in the least restrictive way? A subissue under this point is whether the government objectives would be impeded by recognizing an exemption from the laws, regulations, or policies.

The Forest Service analyzed the situation presented by the applications as follows:

1. The Black Hills are sacred to the Lakota.

2. Occupancy of the Black Hills is not a practice essential to the Lakota religion.

3. Occupancy of the YTC site in particular is not a practice essential to the Lakota religion.

4. Therefore, there is no need to grant a permanent type camp as set forth in Alternative Two.

5. With respect to temporary use of the Black Hills, Indians have free access without interference when visiting the Black Hills to conduct religious ceremonies. Alternatively, access is available because private land in the Black Hills could be purchased.

6. Therefore, there is no need to have an Alternative Three type * religious camp (renewable annual special use permit) for Indians in the Black Hills. (* See page 260, *supra.*)

As mentioned above, practices should not be judged as essential or not; rather, the question is whether a particular site is essential to some religious practice.

*Second*, the Forest Service failed to appreciate that its facially neutral regulations could make illegal, or otherwise burden, conduct dictated by Lakota religious beliefs. The administrative record clearly shows that when the Forest Service considered its policies and regulations in conjunction with the American Indian Religious Freedom Act and the First Amendment, it did not believe existing regulations and policies could be varied because of the free exercise rights of Indians. For example, in discussing the AIRFA, the agency's position was:

This Act, therefore, does not provide authority for the Forest Service to ignore, exceed or circumvent existing laws, policies or regulations. Nor does it provide the applicant with any ownership rights or priority in the use of public lands. (Ex. 1, p. 317.)

It could be argued that this statement was made only with reference to the establishment of a permanent occupancy camp at the YTC site, yet again and again the Forest Service first thought of its own policies and regulations and if it saw a conflict with the needs of Means and others, it simply gave preference to its policies and regulations.

Another example of Forest Service insensitivity to a practitioner of an Indian religion is the case of a $25.00 camping fee charged to Charolette Black Elk for the sweat lodge she used during her Vision Quest ceremony. During the trial the Government took the position that she was treated just like any other camper, yet this position does not consider the constitutional restraints placed on licensing fees that touch upon First Amendment activity. In *Fernandes v. Limmer*, 663 F.2d 619 (1981), the Fifth Circuit stated:

> Exaction of fees for the privilege of exercising First Amendment rights has been condemned by the Supreme Court. (cites omitted).

> \*  \*  \*  \*  \*  \*

> A licensing fee to be used to defray administrative costs is permissible, *Cox v. New Hampshire, supra,* but only to the extent that the fees are necessary. (663 F.2d at 632–33.)

The Forest Service did not analyze the impact its policies and regulations had on the exercise of the Lakota religion. Thus, the Forest Service did not conduct a true balancing of the burden on the applicants against the burden on the government's interest. Nor, did it reach the final stage of questioning whether the government interest was being achieved by the least restrictive means and the related inquiry of whether the creation of an exemption would impede the government interest sought to be advanced. This last step would presumably include an examination of granting Means' and others' application as one of the means of accommodating, in part, Lakota religious needs with a minimal impact on governmental objectives.

*Third,* the Forest Service reliance on the alternative that private land could be purchased for use, while it may be appropriate in cases not involving First Amendment rights, fails to consider the First Amendment principles that:

> [F]reedom of religion [is] available to all, not merely those who can pay their own way.

*Murdock v. Pennsylvania,* 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943).

> " '[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' " *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 76–77, 101 S.Ct. 2176, 2186–2187, 68 L.Ed.2d 671 (1981) (*quoting Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939)). This principle applies with particular force to places, such as church buildings, which have a special spiritual significance to the persons who wish to worship there.

*McCurry v. Tesch,* 738 F.2d 271, 275 (8th Cir.1984).

The Court finds these legal errors in the Forest Service's analysis of the Means and others free exercise claim, particularly with reference to Alternative Three, were prejudicial. *See* 5 U.S.C. § 706.

Ordinarily, after reviewing a final decision from an administrative agency and determining that errors of law had been committed, this Court would correct the errors of law and remand the case to the agency for further consideration in light of the appropriate legal standards. However, because the legal errors relate to matters of constitutional law, further inquiry is necessary.

## II. *De Novo* Review of Constitutional Claims.

In light of *Porter v. Califano, supra,* the Court will combine its review under § 706(2)(B) and the direct review under the Constitution. In both instances the Court can go beyond the administrative record and make findings and conclusions without deference to those of the agency. First,

the Lakotas' claim that the Black Hills are sacred is rooted in religious belief. This belief is sincerely held by Means and others. The practice of conducting religious ceremonies within the sacred environment of the Black Hills is also based on sincerely held religious belief. While the YTC site is spiritually significant to Means and others, much the same way that a particular church is spiritually significant to those who worship there, the Court recognizes that the spiritual significance is of recent origin, approximately four and one-half years, rather than being of traditional or historical significance.

▇ The next step, under *Wilson v. Block, supra,* and the other Indian cases, is to determine whether the Lakotas' access to the Black Hills and performance of religious ceremonies while in the Black Hills has been burdened. The Court specifically disagrees with the agency's determination that "freedom of access to sites, use and possession of sacred objects, and freedom from interference are and continue to be preserved." Ex. 1, p. 288. As found above, Forest Service regulations as applied to Indians who make temporary use of the Black Hills for religious purposes restrict when, where and how the ceremonies are conducted. Also, fees are imposed. These restrictions have a significant negative impact upon the practice of specific religious ceremonies of the Lakota in the Black Hills and a more general stifling effect on the practice of the Lakota religion overall. Because of this negative impact, the Court holds that the laws, regulations and policies of the Forest Service burden the free exercise of the Lakota religion in the Black Hills.

The next question is whether these burdens are justified, i.e., outweighed by the governmental objectives promoted by the regulations and policies. Before the government interest can be appropriately identified and then balanced, it is necessary to specify the burden which it must outweigh. One way to view the burden is to identify the obstacles confronting a particular individual who wishes to conduct a particular religious ceremony in the Black Hills. In that case, the compelling state interest would be identified in reference to the specific rules and policies which were hindering that individual from conducting that particular ceremony. The second way to analyze the burden, and the way this lawsuit was tried, is to consider the overall impact which the specific rules and policies have on the practice of the Lakota religion in the Black Hills. Means and others tried the lawsuit in this fashion because it was the only way they could hope for meaningful relief. Individual practitioners do not have the stamina to litigate each specific claim that might arise. Also, as the facts and circumstances of each individual claim might vary, a judgment which allowed one individual to conduct a given ceremony under certain set of conditions would be no guarantee that a second individual could conduct that same ceremony when time and nature presented different conditions. Consequently, the Court will view the burden in the more general terms as the impact upon the Lakota religion that results from the overall application of the Forest Service's regulations and policies to the Lakota religious practices in the Black Hills. Means' and others' position is that because specific regulations and policies interfere with and raise barriers to individuals conducting religious ceremonies in the Black Hills, the Lakota need a camp which is established for religious purposes and can aid the individuals in complying with the regulations which are in effect within the camp. For example, where an individual wishes to conduct a Vision Quest ceremony, the camp would already have a place for the fire pit and sweat lodge. Thus, the problems which confronted Charlotte Black Elk in finding a suitable location for her sweat lodge fire pit and then having to pay a camping fee could be avoided through the establishment of a religious camp for the Lakota.

▇ Consequently, the governmental interests which must be analyzed are those relating to the rejection of a religious camp within the Black Hills not the specific gov-

ernmental interest which is served by the particular regulation which burdens an individual performance of a particular ceremony. While the government certainly has an interest in using the National Forest for timber, grazing, and recreational uses, the Court does not find these interests to be compelling. First, the removal of the 800 acres from these types of uses is not significant in the context of the whole Black Hills National Forest. Next, granting an application along the lines of Alternative Three (see pages 27 and 30 of this order) would not set a precedent which would entitle other groups to similar camps. This group of Lakota Indians and those exercising the Lakota religion have shown that they meet certain tests under the First Amendment which are not likely to be met by other groups. Finally, the Court concludes that the Forest Service objective in its overall management of the Black Hills National Forest is not materially impaired by granting Means and others use of the 800 acres. That type of "exemption" to the regulations and policies of the Forest Service accommodates the religious needs of Means and others; it allows the government to achieve its multi-use objectives on the remaining 1,523,000 acres of the Black Hills National Forest.

The Forest Service expresses concern that by allowing Means and others use of this federal property it may be advancing the religious interests of a particular group in violation of the Establishment Clause of the First Amendment. This position is particularly ironic in light of the number of Christian churches which exist on land in the Black Hills National Forest and the Placerville Camp of the United Church of Christ. The irony is further enriched by the fact that Christian groups, unlike the Lakota, do not consider the Black Hills to be a location central to their religious beliefs. The Court recognizes that it is not always easy to determine when accommodation is prohibited and when it is required under the Religious Clauses. *See* L. Tribe, *American Constitutional Law,* § 14-4 (1978). However, in view of *Chess v. Widmar,* 635 F.2d 1310 (8th Cir.1980), and

*O'Hair v. Andrus,* 613 F.2d 931 (D.C.Cir. 1979), the Court concludes that making the 800-acre site available to Means and others through the use of a special use permit would not violate the Establishment Clause. Indeed, it is a necessary accommodation under the Free Exercise Clause.

### III. Non-Constitutional Factual Findings.

#### A. Standard of Review.

██ The parties disagree as to the standard to be applied by this Court in reviewing the non-constitutional findings and rulings of the Forest Service. Means and others argue that because the Court took jurisdiction over the administrative appeal, it has the same power and authority as the Regional Forester who would have heard the administrative appeal. The Court has reviewed the record and finds that the Government did not agree to a *de novo* standard of review. The agreement was that the issue was before the Court and was silent as to the standard of review. Nor can the Court hold that the manner in which the administrative appeal was handled and brought before this Court gives rise to the legal consequence that *de novo* review is proper notwithstanding the limitations of 5 U.S.C. § 706. *See Independent Meat Packers Ass'n v. Butz,* 526 F.2d 228, 239 n. 30 (8th Cir.1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). Rather, it appears, as contended by the Government, that the denial of the permit is an "agency action" which must be reviewed in accordance with the Administrative Procedure Act. *See* 5 U.S.C. § 704.

#### B. Arbitrary and Capricious.

Assuming the arbitrary and capricious standard applies, the first question to address is the *scope* of review. The rule is well established that "when a court reviews agency action, it may not consider evidence outside the administrative record for the purpose of substituting its judgment for that of the agency." *Arkla Exploration Co. v. Texas Oil & Gas Corp.,*

734 F.2d 347, 357 (8th Cir.1984). Nonetheless, this Court, as mandated by *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823, must conduct a thorough, probing, in-depth review of the record, Ex. 1, and related documents. Furthermore, under the arbitrary and capricious standard, this Court may admit and use supplementary evidence to explain the record and to determine whether the process employed by the agency in reaching its decision took into consideration all the relevant factors. *Arkla Exploration Co. v. Texas Oil & Gas Corp., supra; Asarco, Inc. v. Environmental Protection Agency*, 616 F.2d 1153, 1159 (9th Cir.1980). In this case, the Court needed additional evidence to explain the practice of the Lakota religion and to properly address whether the forest supervisor considered all the factors he should have and did not consider factors which were not proper. The parties were in agreement that the key issue in the trial was whether or not the Forest Service properly denied the permit. Vol. V, p. 167.

### C. *De Novo* under *Overton Park.*

Under *Overton Park* the first question this Court must consider is whether the Forest Service's denial of the special use permit was "adjudicatory" or "nonadjudicatory" action.

Section 706 does not mention the term "adjudicatory" or the term "nonadjudicatory." Nor does the subchapter of the APA governing judicial review define the terms. *See* 5 U.S.C. §§ 701–706. Since the adjudicatory-nonadjudicatory dichotomy is judge made, the real question is what the Supreme Court meant when it used those terms. This Court holds that the Supreme Court used those terms consistent with the definitions in the subchapter of the APA governing administrative procedure. *See* 5 U.S.C. § 551. Section 551(7) states that " 'adjudication' means agency process for the formulation of an order." In turn, " 'order' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule mak-

ing but including licensing." 5 U.S.C. § 551(6). "Licensing" includes the agency process respecting the grant or denial of an agency permit. 5 U.S.C. § 551(8), (9).

The Court concludes that the special use permit which was denied by the Forest Service in this case is a "license" within the meaning of 5 U.S.C. § 551(8). The Court next concludes that the denial of the special use permit by James Mathers, Forest Supervisor, and the subsequent decision by the Regional Forester, Craig Rupp, not to consider the administrative appeal of the denial was a "final disposition ... of an agency matter" and, thus, was an "order" within the meaning of 5 U.S.C. § 551(6). Next, the Court concludes that the process of the Forest Service in formulating the denial of the special use permit was an "adjudication" as that term is used in 5 U.S.C. § 551(7) and, therefore, the action of the Forest Service was "adjudicatory in nature" as that phrase is used in *Overton Park.*

Having decided that the Forest Service action in denying the permit was adjudicatory in nature, the next issue is whether or not the Forest Service's factfinding procedures were inadequate. *Overton Park, supra*, 401 U.S. at 415, 91 S.Ct. at 823.

The Supreme Court has given little guidance as to when "agency factfinding procedures are inadequate." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 415, 91 S.Ct. at 823. *See Camp v. Pitts*, 411 U.S. 138, 141–43, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973) (per curiam) (only deficiency claimed in proceedings was inadequate explanation of decision; held no *de novo* review). The legislative history of the APA is helpful in this regard.

The sixth category, respecting the establishment of facts upon trial *de novo*, would require the reviewing court to determine the facts in any case of adjudication not subject to sections 7 [Hearings required by section 4, Rule making, and section 5, Adjudications, or other statute] and 8 [Agency decisions after hearing] or otherwise required to be reviewed exclusively on the record of a statutory agen-

cy hearing.... In other cases, the test is whether there has been a statutory administrative hearing of the facts which is adequate and exclusive for purposes of review.... In short, where a rule or order is not required by statute to be made after opportunity for agency hearing and to be reviewed solely upon the record thereof, the facts pertinent to any relevant question of law must be tried and determined *de novo* by the reviewing court respecting either the validity or application of such rule or order—because facts necessary to the determination of any relevant question of law must be determined of record somewhere and, if Congress has not provided that an agency shall do so, then the record must be made in court.

H.R.Rep. No. 1980, 79th Cong., 2d Sess. 45–46 (1946), U.S.Code Cong. & Admin. News 1946, p. 1195.

This Court has found two decisions by Circuit Courts of Appeal which found "inadequate procedures" existed. *National Organization For Women, Washington, D.C. Chapter v. Social Security Administration,* 736 F.2d 727 (D.C.Cir.1984); *Porter v. Califano,* 592 F.2d 770 (5th Cir.1979). Inadequacy will be discussed below.

### D. Findings.

In reviewing what the Forest Service did, the evidence clearly demonstrates that Mr. Mathers' conduct is crucial, as he takes full responsibility for the decision to deny the permit. Vol. V, pp. 135, 171. "I handled this as a personal responsibility. I ordinarily don't do this." Vol. V, pp. 187, 189. "I see very few special use applications. I got into this one because of the very fact that Indian people were making the application." Vol. V, pp. 186–87. "I felt that the Yellow Thunder applicants were trying to intimidate the Forest Service." Vol. V, p. 142. "The conclusion was that the granting of a special use permit was not essential to the practice of your [Lakota] religion." Vol. XIX, p. 216.

"My decision is contained in Ex. 1, page 287. The basis for my decision was that *no* community should be permitted in the National Forest." Vol. V, pp. 143, 151. "No community of any size would be approved. I knew this right from the start but I still okayed the environmental analysis to get more information concerning the American Indian religion." Vol. V, pp. 179–80. Alternative Three was not seriously considered but was rejected out of hand because of the private land alternative and the perception that existing regulations did not burden the practice of the Lakota religion in the Black Hills. Mathers admits that Exhibit 83 is a directive by the Department of Agriculture to the Forest Service mandating that positive steps should be taken to encourage, facilitate, promote and issue special use permits in carrying out the provisions of the American Indian Religious Freedom Act, but in the next breath he says, "We didn't take any such steps." Vol. V, p. 220.

Mr. Mathers further states that the American Indian Religious Freedom Act is a mandate to facilitate the observation of Native American religion. Vol. V, p. 208. Further, "Facilitating expression of Indian culture and Indian religion is something I regard as being in the public interest but not when the applicants are asking for a 'community.'" Vol. V, p. 206. "My reason for being against the establishment of a 'community' is that it is my belief that it would not be in the national interest." Vol. VI, p. 123. "If the application was for 5 buildings instead of 80 my decision would be the same." Vol. V, p. 154. "No community of any size would be approved." Vol. V, p. 179. "There is no new law tightening up the policy regranting such a community, we have just done it." Vol. VI, p. 123; Vol. XIX, p. 207. He goes on to say, "I know that there is no particular law that prevents one." Vol. XVII, p. 124, and Vol. XVIII, p. 93. Mr. Mathers does admit that the Forest Service policies have gone around the cycle a number of times, i.e., they have changed. Vol. XIX, pp. 205, 217. "Well, I don't believe that it's in the purview of the Forest Service to make up for the past injustices." Vol. XVIII, p. 51.

At this point, it might be well to refer to the history of use permit applications. In the five and one-half years prior to the commencement of this trial, 61 applications were received by the Forest Service. Fifty-eight were granted; three were denied. All 58 approved were made by non-Indians; all three that were denied were made by Indians Vol. V, p. 185. When Mr. Mathers was asked about this, he said that this did not bother him. Vol. V, p. 185. He later said that during all his time in the Forest Service, he could not remember that there ever was a use permit application approved for an Indian. Vol. XIX, p. 211.[7] The Kyle report, Ex. 87, p. 1, states, "There are negative feelings in the forest service against Native Americans, the same as in the area [western South Dakota]." Vol. V, p. 156; Ex. 87, p. 1. Mr. Mathers readily admits this when he says, "The negative feelings in the Forest Service did not affect my decision." Vol. V, p. 156. However, he further said that if Yellow Thunder gets a use permit, the floodgates are open and every Indian group would be applying. Vol. V, p. 202.

The United Church of Christ has a year-round, five-building facility on 12 acres of the National Forest. Vol. XIX, p. 218. It has been in existence since 1921 (Vol. XIX, p. 149) and, in 1980, its use permit was renewed by the Forest Service for an additional 20 years. Ex. 76. Mr. Mathers acknowledged that the purpose of the facility

was a "religious center." Vol. XVII, p. 130. Another example of an exclusive private use in the National Forest is the Tomahawk Lake County Club golf course (Exs. 117, 118). The use permit for this course was first issued in 1944 and covers over 80 acres and bars the public from using that area unless club fees are paid. Vol. VI, pp. 150–51. The Country Club pays $25.00 per year rent for the 80-plus acres. Vol. VI, p. 152. When confronted with this situation on cross-examination, Mr. Mathers flatly stated that these uses would not be approved if originally applied for now. Vol. XIX, p. 217.

The Court is persuaded that the evidence set out above overwhelmingly demonstrates the policy of the Forest Service as implemented by Mr. Mathers is that Indians do not get use permits. The Government argued that we "almost" gave one to Charles Fast Horse[8] (Vol. XIX, p. 154) and "almost" gave another one to Miss Black Elk (Vol. XIX, p. 155). Exhibit N sets out Mr. Fast Horse's contention that he could not communicate with Mr. Mathers and wanted to go over his head. Vol. VI, p. 87. What they almost did does not help much when applying the adage, "By their deeds you shall know them."

In another vein, there are important things Mr. Mathers did not do that should have been done if a fair decision were to be made. At the time he made his decision to

---

7. While there was no testimony or argument regarding statistical proof, this Court, in light of this obvious situation, believes it is appropriate to quote from *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 where the court said:

The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. *Hernandez v. Texas*, 347 U.S. [475] at 478–479 [74 S.Ct. 667, at 670–671, 98 L.Ed. 866 (1954) ]. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time.... This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination ....[13]

[13] The idea behind the rule of exclusion is not at all complex. If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process.

*Castaneda v. Partida, supra*, at p. 494 and n. 13, 97 S.Ct. at 1280 and n. 13.

*See also Inmates of Nebraska Penal, Etc. v. Greenholtz*, 567 F.2d 1368, 1375 (8th Cir.1977), where that court said:

Indeed, the statistical disparity shown may occasionally be so "gross" or "stark" or "dramatic" that it alone will constitute prima facie proof of purposeful discrimination.

8. Here the "prime" reason the application was denied was because there was private land available. Vol. XIX, p. 154.

deny the use permit, he was admittedly poorly prepared to do so. "I know very little about Indian religion." Vol. V, p. 208. "I don't know a lot of Indian people." Vol. VI, p. 133. "The provisions of the American Indian Religious Freedom Act requiring consultation with traditional religious leaders does not apply to me personally because I am not the head of an agency." Vol. XVII, p. 113. This despite the fact that he said a mandate had been issued to facilitate Indian use permits (Vol. V, p. 208) and that he alone had made the decision to deny (Vol.V, p. 171).

Although he knew from the outset that the application was going to be denied because it was a "community" and he had decided they should seek to buy private land [9] (Vol. V, p. 179), he still approved the environmental analysis so as to get more information concerning the American Indian religion (Vol. V, pp. 179–80). He did this in part to comply with the National Forest Management Act, which requires consultation with tribes. Vol. XIX, p. 182. Reverend Fredrickson was contacted, after YTC was open, to set up meetings on various reservations. He agreed and testified that his reason was "I decided to help an agency that knew nothing about Indians." Vol. XIX, p. 123. Several meetings were held.

Again, although he knew at the outset that the application was going to be denied, Mr. Mathers directed that an extensive series of questions, Exhibit I, was sent to the applicants. It was very detailed and considered by the applicants to be an affront and they refused to answer. Vol. V, p. 182. The testimony revealed that no other church group had ever been asked such religious questions. Vol. V, pp. 184, 189. A couple of examples from the questions, Exhibit I, § 1G, were: "Which, if any, of the members of the 'Yellow Thunder Camp' or the 'Lakota Nation' group are recognized as medicine men? What specific

powers do each of the medicine men claim to have?"

This incident further polarized the parties and gave Mr. Mathers another hindsight reason for denying the application.

The Court is persuaded that at the time he made his decision, Mr. Mathers was poorly informed as to what was involved in the practice of the Indian religion and particularly what ceremonies were tied to the Black Hills and really what the basic situation was. Mr. Mathers agrees. Vol. V, p. 208.

The Forest Service, through Mr. Mathers, at the onset of the trial took the position that the best way to run the forest is by a "multiple use" policy, a concept whereby the entire forest should be used for the good of all. This involved recreational, timber, mining and grazing. Early on in the trial, the evidence developed that YTC had little or no impact on any of these uses. Mining (Vol. XIX, p. 226), timber (Vol. V, p. 148; Vol. VI, p. 34; Vol. XIX, p. 226), and grazing (Vol. VI, p. 130) were practically conceded by the Government to have no impact on YTC. Recreational use was the subject of substantial evidence. The Government position was that no group is entitled to any semiprivate or private use of the Black Hills for any purpose and that there was no such activity in the Black Hills nor should there be. The Court asked for a computer breakdown of all special use permits in the Hills and was told that there was none. After insistance, Exhibit 20 [10] surfaced, which is just such a computer breakdown, which lists hundreds of parcels where semiprivate and private use of the Black Hills is permitted. After that, there was little argument in promoting recreational multiple use except to say the Forest Service would not grant such "communities" now, although they did concede they renew these "old" uses all the time.

---

**9.** The idea that private land should be used was a primary reason for denying Alternative Three.

**10.** Exhibit 20 is a computerized list of the special use permits now in force in the Black Hills.

An examination of it would reflect the kinds of uses that are made of both the privately and publicly held land.

Mr. Mathers agrees that the American Indian Religious Freedom Act is a mandate (Vol. V, p. 208) and requires that special use permit applications under the Act shall be given careful consideration even in situations where applications based on other grounds would not be approved. Vol. V, pp. 209–10. Mr. Mathers says he did exercise the required careful consideration. For all reasons set out above, this Court is not so persuaded.

With respect to the matter of the discrimination towards Indians and towards conduct involving use of the Black Hills for Indian religious purposes, the agency factfinding procedures were inadequate. Inadequacy occurred because factfinding procedures regarding the claim of discrimination against Indians simply did not exist. The applicants had no opportunity to present this claim to the Forest Service because the administrative appeal taken from the denial of the special use permit was stayed due to the Forest Service's interpretation of 36 C.F.R. § 211.19(b)(3). The lack of opportunity to present one's position is as bad, if not worse, than the lack of an opportunity to respond to or rebut the government's position, *see National Organization for Women, Washington, D.C. Chapter v. Social Security Administration*, 736 F.2d 727, 738–42 (D.C.Cir.1984), or presenting one's charge of corruption to a system in which those explicitly accused of corruption play a chief role. *Porter v. Califano*, 592 F.2d 770, 782 (5th Cir.1979). Consequently, the Court finds that the factfinding procedures were inadequate regarding the claim of discrimination against Indians. In the alternative, accepting the government's position that the Forest Service action was nonadjudicatory in nature, the Court finds that the issues regarding discrimination "were not before the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 415, 91 S.Ct. at 823. Finally, this Court's findings regarding discrimination are appropriate under *Arkla Exploration Co., supra*, because they relate to the

factors forming the basis for the agency's decision.

Next, this Court's findings about Mathers' lack of any knowledge of and failure to consider the religious needs of the Lakota are also appropriate under *Arkla Exploration Co., supra*.[11]

■ In summary, the Court specifically finds the denial of the special use permit was arbitrary and capricious. The Court further finds that Forest Service policies as implemented by Mr. Mathers—including his decision to deny the special use application—have the effect of discriminating against Indians who are trying to practice their religion. The Court further finds that Mr. Mathers is subconsciously biased against Indian applicants and that Forest Service policy is skewed such that it discriminates against Indian applicants. He acknowledges that Indian people should be treated equally (Vol. XVIII, p. 21), but just cannot bring himself to see that that happens. Further, Mr. Mathers is biased in favor of the Forest Service's multiple use policy and this bias causes him to reject other uses out of hand as soon as he sees they are not consistent with the multiple use policy. As a result, Mr. Mathers' decision was based on factors which were not proper for consideration. Also, his decision was made without considering relevant factors. The Court further finds and concludes that Mr. Mathers' decision was based on a clear error of judgment.

IV. Relief.

This Court is convinced that Mr. Mathers matured and broadened his position from the date of the denial of the use permit, August 24, 1981, to the day he testified at the last session of this trial, as did everyone else involved, including the Forest Service (*see* Ex. A–8).

Early on, Mr. Mathers' position was not to consider any alternatives. Vol. V, p. 154. He was less than impressed with the

---

**11.** This determination is made in the interest of giving the full picture to those reviewing this decision. The findings about religious needs

are also appropriate under the Free Exercise claim and § 706(2)(B).

rhetoric of YTC people (Vol. V, pp. 199–200), "There was an attempt to intimidate the Forest Service." (Vol. V, p. 142). YTC accused Mathers of punishing (by denial of the application) free speech. Vol. V, p. 200. Mr. Mathers did not admit this, but did revealingly say, "I considered that [such rhetoric] as one important feature in the reasons the application was denied." Vol. V, p. 201.

YTC people now admit that the application was very broad and that the rhetoric was too tough; they too have matured and now say they are ready to build a new relationship with the Forest Service. Vol. XX, p. 229.

Mr. Mathers later said, "I had a lot to learn about Indian religion, I held meetings to learn more." Vol. XIX, p. 181. "I now concede that the Indians consider the Black Hills sacred." Vol. XVII, p. 127; Vol. XVIII, p. 2. "If Yellow Thunder people had proceeded like Fast Horse did, they would have received a better response." Vol. VI, p. 134.

"It is in the public interest to facilitate the expression of Indian culture and Indian religion." Vol. V, p. 206. "We have a mandate to do so." Vol. V, p. 208; Ex. 83. "I believe it might have been a productive step in eradicating racism in South Dakota if Fast Horse had been granted a use permit." Vol. VI, p. 128. Further, he indicated that approval of YTC's application would also be a productive step if they were not asking for a "community." Vol. VI, p. 129.

William Means clearly pointed out, "We are willing to compromise." Vol. XX, p. 228. Mr. Mathers says, "Perhaps we should not be so restrictive." Vol. XVII, p. 136. This Court considered setting out a list of the "dumb" things each side did during the entire proceeding, but concluded that reflection by the parties would remind them and they will be avoided in future dealings.

This Court is not unmindful, nor is Russell Means unmindful, that the possibility of acceptance of Yellow Thunder would be enhanced if Russell Means and AIM were not involved. However, based on the broad support (elders, religious leaders, non-Indian clergymen and others), this Court is persuaded that on this issue, AIM is in the mainstream, along with other non-Indian solid citizens. Vol. XI, p. 34. Mr. Mathers says he can work with A.I.M., Vol. XVII, p. 115, and also with the Dakota American Indian Movement, Vol. XVII, p. 117.

The Sioux Falls Argus Leader, largest newspaper in the state, editorializes:

The Congressional bill [Ex. N–1 in this lawsuit] [12] is a small step to acknowledge the reverence in which the Indians hold the Black Hills. We'd also like to believe that South Dakotans would be receptive to Means' [William] point that "Cowboys and Indians have got to work together to survive."

With the foregoing in mind, the Court turns to the type of relief that would be appropriate in this case.

Means and others are no longer asserting that they need a permanent camp with 83 buildings as was submitted in their application and was considered by the Forest Service as Alternative Two. In their proposed judgment Means and others request a special use permit which would allow for 23 structures to be built on the 800-acre site. The evidence submitted at trial shows that a camp with 83 buildings is not practical or feasible.

Mr. Mathers has stated that "if an applicant comes in and wants to discuss alternatives, we will do it." Vol. V, pp. 160–61. He also says, "I have a great deal of discretion." Vol. XVII, p. 118.

■ The Court concludes that Means and others are entitled to a special use permit which would allow them to establish a religious camp at the YTC site. This

12. H.Res. 5664, 97th Cong., 2d Sess., provided that for a ten-year period, the Yellow Thunder Camp area would be withdrawn from public use in order that the Sioux Nation may use such land as a cultural and religious resource area. It has had little support because the matter was "in the courts" in this case.

camp may have a school for the education of the young in the traditional spiritual ways of the Lakota. Also, the camp may allow for year-around—assuming year-around is necessary—living facilities for a support staff which is necessary to maintain the religious and educational functions of the camp. A community, yes; a city, no; a religious center such as the United Church of Christ admittedly has. Vol. XVII, pp. 130–31.

Although much testimony was heard and many documents submitted, the Court is not in a position to nor does it want to draw the blueprints for a Lakota religious camp. Rather, the Court will require Means and others to submit a plan for such a camp to the Forest Service. The Forest Service shall review the proposed plan and shall make comments and suggestions about matters which might affect some governmental interest. Next, the parties shall meet to work out to their mutual satisfaction as many details as they can.[13] The specifics which cannot be worked out shall be resolved by the Court. To make such a resolution, the Court may require additional evidence by way of affidavit or testimony. Neither party shall waive any position or right to later appeal by working with the other to formulate the details of the special use permit which shall be granted. The Court expects the parties to cooperate in the same commendable manner that the Indians and the Air Force did in working out some knotty problems. Vol. XII, pp. 161–63, 176–71; Vol. XIII, p. 89; Vol. XIV, p. 51.

The general parameters within which Means and others shall construct their proposal is as follows. The camp shall be a religious camp and shall be used to facilitate religious ceremonies and practices within the 800 acres. If less than 800 acres is needed for a camp of this type, they shall so state. In order to properly assess the needs which the camp must serve, Means and others should list the types of ceremonies and practices to be conducted; the requirements of those ceremonies in terms of space, solitude, and physical criteria such as fire pits, etc.; and, the times of year that such ceremonies will be conducted. With respect to the school, Means and others shall state in their proposal the times of year that it will be held, how large of an enrollment they expect, and other needs that relate to the school that should be considered in the plan that may be adopted. Finally, with respect to living quarters, much will depend on the support and guidance that is necessary to help those coming into the camp on a temporary basis to conduct or participate in religious ceremonies. Also, the support staff for the school may need quarters. If neither the ceremonies nor the school are conducted on a year-around basis, then it may be year-around facilities are not needed, except for a caretaker to discourage vandalism.

The Court concludes that this type of relief is appropriate under the APA, *see* Title 5, §§ 702, 706(1); Vol. 4 (K. Davis), *Administrative Law Treatise*, § 23:10, at 165 (2d ed. 1983), and as a remedy for the violations of the Constitution. Said treatise at page 65 states as follows: "A court has jurisdiction under either 28 U.S.C. § 1331 or § 1361 to require an agency to perform such duties as the law imposes on it, and the scope of review is governed by 5 U.S.C. § 706." *See also Asarco v. OSHA,* 647 F.2d 1, 2 (9th Cir.1981).

V. Appeal.

For all of the reasons set out above, the Court does not intend this Order to be a "final decision" for the purposes of 28 U.S.C. § 1291. "A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 901 (1945). *See also Coopers v. Livesay,* 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351. *See also Toronto-Dominion Bank v. Central Na-*

---

**13.** Such a meeting, prior to this ruling, was not feasible from the Forest Service's point of view, because this matter was "in the courts," but its time has now come. Vol. XII, p. 93.

*tional Bank & Trust Co.*, 753 F.2d 66, 70 (8th Cir.1985), where the court dismissed the appeal for lack of jurisdiction, finding that the district court specifically retained jurisdiction. *See also Iowa Beef Processors v. Bagley*, 601 F.2d 949, 952 (8th Cir.1979). Thus, the Clerk of Court shall not now enter judgment on a separate document under Fed.R.Civ.P. 58 as a result of this Order. Nor will the Court grant either party the opportunity to take an interlocutory appeal from this Order under 28 U.S.C. § 1292(b). In short, the parties will not be able to appeal the rulings of this Court until after the specifics for the relief have been worked out and the Court directs the Clerk of Court to enter judgment. This Court appreciates the amount of energy the Circuit has already expended on this case and believes the Circuit should not be asked to consider the liability and relief portions of this Court's decision on the merits in piecemeal fashion.

IT IS THEREFORE ORDERED that the parties shall proceed in a manner consistent with this Court's Order. Means and others shall submit a sensible proposed plan in accord with these findings to the Forest Service within thirty days after the date this Order is filed. The Forest Service shall return its comments and suggestions regarding its concerns to Means and others within twenty days after receiving the proposed plan. Within ten days after receipt of the Forest Service's response to the proposed plan, representatives of the parties shall meet and agree on as many of the details of the special use permit as is possible. After such meeting each side shall file a report to the Court setting forth the status and results of their meeting. These reports shall be due ten days after the meeting. Once again, none of the parties shall waive any of their rights or legal positions by participating in these procedures.

IT IS FURTHER ORDERED that all exhibits offered by the United States on which the Court had reserved ruling were admitted into evidence and fully considered by the Court.

IT IS FURTHER ORDERED that all exhibits offered by Means and others on which the Court had reserved ruling were denied admittance into evidence and were not considered by the Court.

IT IS FURTHER ORDERED that this Order is not a "final decision" and, thus, is not appealable. Appeals may be taken after judgment is entered.