**The INUPIAT COMMUNITY OF the ARCTIC SLOPE, a federally-recognized Indian tribe; Ukpeagvik Inupiat Corporation, a native village corporation, et al., Plaintiffs,**

v.

**The UNITED STATES of America, et al., Defendants.**

**No. A 81–19 Civil.**

United States District Court, D. Alaska.

Oct. 1, 1982.

---

James D. Gilmore, Gilmore & Feldman, Anchorage, Alaska, Richard M. Berley, Rob-

ert L. Pirtle and Mason Morisset of Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., for plaintiffs.

Cynthia Pickering, Asst. U. S. Atty., and Michael Spaan, U. S. Atty., Anchorage, Alaska, for United States of America, Cecil D. Andrus, Sec'y of Interior and Frank Gregg, Director of the Bureau of Land Management.

Thomas E. Meacham, Asst. Atty. Gen., State of Alaska, Anchorage, Alaska, for Jay Hammond, Governor of the State of Alaska and Robert E. Leresche, Commissioner of Alaska Dept. of Labor Resources.

Dan A. Hensley and Margie Mac Neille of Duncan, Weinberg & Miller, Anchorage, Alaska, for Koniag, Inc.

William H. Timme, Wilkinson, Cragun & Barker, Anchorage, Alaska, Richard Anthony Baenen, Erwin Foster De Reitzes and Jacquelyn R. Luke, Washington, D. C., for NANA Regional Corp.

Bruce Monroe, Birch, Horton, Bittner, Monroe, Pestinger & Anderson, Juneau, Alaska, for Sealaska Corp.

Carl J. D. Bauman and Richard O. Gantz of Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, Alaska, Edward R. Mackiewicz and Brice M. Clagett of Covington & Burling, Washington, D. C., for Amoco Production Co., Atlantic Richfield Co., B. P. Alaska Exploration, Inc., Chevron, Cities Service Oil Co., Conoco, Inc., Exxon Corp., Gulf Oil Corp., Hamilton Bros. Oil Co., Murphy Oil, Phillips Petroleum Corp., Rowan Drilling Co., Shell Oil Co., Sohio Natural Resources, Texasgulf, and Union Oil Co.

## OPINION

FITZGERALD, District Judge.

In this case the Inupiat people of Alaska's north slope seek to quiet title in large portions of the Beaufort and Chukchi Seas beyond the three mile limit.[1] The plaintiffs include the Inupiat Community of the Arctic Slope, a federally recognized tribe, suing on its own behalf and on behalf of its members, the Ukpeagvik Inupiat Corporation, a village corporation organized pursuant to the Alaska Native Claims Settlement Act, suing on its own behalf and on behalf of its members, and two native allotees. The defendants include numerous oil companies, the United States, its Secretary of the Interior and its Director of Land Management, and the State of Alaska, its Governor and its Commissioner of Natural Resources.[2]

This is not the first time that these parties have met in a courtroom. This suit is but the latest in a line of legal actions through which the Inupiat Eskimo have sought control over the region in which they have long resided. In an earlier proceeding the Inupiat sought recovery in damages for trespass on native lands in the time period prior to the enactment of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601–1628, *United States v. Atlantic Richfield Co.,* 435 F.Supp. 1009 (D. Alaska 1977), *aff'd,* 612 F.2d 1132 (9th Cir.), *cert. denied,* 449 U.S. 888, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980); *see also Edwardsen v. Morton,* 369 F.Supp. 1359 (D.D.C.1973). Later the Inupiat filed proceedings in the Court of Claims alleging that the United States had breached a trust responsibility in not protecting the Arctic slope from development and that extinguishment of their trespass claims by ANCSA was an unconstitutional taking. That claim was also rejected. *Inupiat Community of the Arctic Slope v. United States,* 680 F.2d 122 (Ct.Cl.1982).

1. The complaint also seeks damages for trespass in an unspecified amount, imposition of a constructive trust on the revenues from all past and future oil, gas and mineral recoveries in the area, an injunction against any use by the defendants that interferes with the plaintiffs' rights, an injunction against any further leasing on the outer continental shelf which would interfere with plaintiffs' rights, a declaration that the Outer Continental Shelf Lands Act is unconstitutional as applied, at least to the extent that it is inconsistent with Inupiat rights in the area, and an order directing defendants and their agents to remove all structures and equipment from the plaintiffs' property.

2. The Inupiat conceded at oral argument that the state is only a nominal party since their claims begin at the three mile limit, which is the state's boundary.

More recently, the Inupiat sought to enjoin on environmental grounds the 1979 Beaufort Sea lease-sale. They claimed that the sale and its consequent environmental damage to their traditional fishing and whaling areas would violate a federal trust responsibility owed to them and would violate numerous federal statutes as well. Although the district court granted the injunction, it was overturned by the court of appeals which found that the federal government had acted in conformity with the applicable law. *North Slope Borough v. Andrus,* 486 F.Supp. 332 (D.D.C.1980), *rev'd.* 642 F.2d 589 (D.C.Cir.1980). In May of 1981, the Inupiat moved to intervene in an action currently pending before the United States Supreme Court acting under its original jurisdiction. *United States v. Alaska,* No. 84 Orig. (U.S.1980). That action concerns a dispute over the exact location of the three mile limit in the Beaufort Sea. By their complaint in intervention, the Inupiat have requested that the United States Supreme Court hear essentially the same title and sovereignty claims which they assert here.

In this present proceeding, the Inupiat again challenge the lease-sale made in the Beaufort Sea in 1979. They assert that they possess sovereign rights and unextinguished aboriginal title to the area lying from three to sixty-five miles off-shore in the Beaufort and Chukchi Seas of the Arctic Ocean. In support of the contention, the Inupiat claim exclusive use and occupancy of the superjacent sea ice from time before human memory. This claim, according to the Inupiat, establishes rights to the surface of the sea, the water column beneath it, the seabed, and the minerals lying beneath the seabed within the geographic boundaries of their claim. In addition to injunctive relief, the Inupiat seek damages and a declaration of their title to and control over the area.

This litigation does not involve property rights arising out of federal statute or by reason of any treaty to which the United States is a party. The Inupiat claims rest on immemorial use and occupancy alone. To support their allegations they have filed in this court numerous documents including affidavits, government records and scholarly works attempting to document their traditional use of the sea ice as living space.

All defendants have answered the Inupiat claims and have moved for judgment on the pleadings reserving for later issues of limitation, standing and capacity. At this time I address only the motion for judgment on the pleadings which shall be considered as a motion for summary judgment since additional documents have been filed and considered. Fed.R.Civ.P. 12(c).

██ In support of their motions the defendants argue, among other things, that the result of this case is controlled by a line of Supreme Court cases beginning with *United States v. California,* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947) in which the Court first recognized the paramount rights of the United States in ocean waters lying seaward of the ordinary low water mark. In opposition, the Inupiat undertake to distinguish these authorities by arguing that the previous cases deal only with the competing rights of the federal government and the states and have little to do with the rights of American natives such as themselves. I disagree. To accept the interpretation now urged by the Inupiat would be to ignore the underlying principle upon which the Supreme Court has placed reliance, that federal supremacy over the adjacent seas is an essential element of national sovereignty. I therefore conclude that claims of sovereign power over the oceans whether made by one of the several states in the Union or by the Inupiat or by any other native tribe is inconsistent with national sovereignty and must fail. *United States v. Maine,* 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363 (1975); *United States v. Texas,* 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950); *United States v. Louisiana,* 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950); *United States v. California,* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947).

The controlling issue of whether the state or the federal government had the right to lease mineral resources of the ocean seabed was addressed by the Supreme Court for

the first time in *United States v. California,* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889. In reaching its decision the Court reasoned that "protection and control of [the three mile belt] has been and is a function of national external sovereignty." *Id.* at 34, 67 S.Ct. at 1666. This was necessarily so, the Court concluded, since

> [A]s peace and world commerce are the paramount responsibilities of the nation, rather than an individual state, so, if wars come, they must be fought by the nation. The state is not equipped in our constitutional system with the powers or facilities for exercising the responsibilities which would be concomitant with the dominion which it seeks .... [N]ational interests, responsibilities and therefore national rights are paramount in waters lying to the seaward in the three-mile belt.

332 U.S. at 35–36, 67 S.Ct. at 1666–1667. If a state is not equipped with the powers and facilities necessary to undertake the responsibilities concomitant with dominion over the seas, certainly the Inupiat are less so.

In *United States v. Louisiana,* 339 U.S. at 699, 70 S.Ct. at 914, 94 L.Ed. 1216, the Supreme Court extended the holding of *California* beyond the three-mile limit and applied it to the outer continental shelf. Once again, the Court reiterated that

> The marginal sea is a national, not a state concern. National interests, national responsibilities, national concerns are involved. The problems of commerce, national defense, relations with other powers, war and peace focus there. National rights must therefore be paramount in that area.

339 U.S. at 704, 70 S.Ct. at 916. In extending federal control as far as 27 miles offshore, the Court said:

> If, as we held in California's case, the three-mile belt is in the domain of the Nation rather than that of the separate States, it follows *a fortiori* that the ocean beyond that limit also is. The ocean sea-

ward of the marginal belt is perhaps even more directly related to the national defense, the conduct of foreign affairs, and world commerce than is the marginal sea. Certainly, it is not less so.

339 U.S. at 705, 70 S.Ct. at 917. In the companion case of *United States v. Texas,* 339 U.S. at 707, 70 S.Ct. at 918, 94 L.Ed. 1221, the Court rejected state claims of sovereignty and ownership over the seabed extending some ten miles offshore and dating from the period when Texas was an independent republic. In doing so, the Court said:

> [O]nce low-water mark is passed the international domain is reached. Property rights must then be so subordinated to political rights as in substance to coalesce and unite in the national sovereign. Today the controversy is over oil. Tomorrow it may be over some other substance or mineral or perhaps the bed of the ocean itself. *If the property, whatever it may be, lies seaward of low-water mark, its use, disposition, management, and control involve national interests and national responsibilities. That is the source of national rights in it.*

339 U.S. at 719, 70 S.Ct. at 924. (Emphasis supplied).[3]

The Court has recently reaffirmed these principles in the face of a strong challenge from the 13 eastern seaboard states. *United States v. Maine,* 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363 (1975). These states base their claim to the entire continental shelf on a demonstration of interest and sovereignty dating from earliest colonial times. While they argued that their claims were not foreclosed by the previous line of cases beginning with *California,* they also argued that that line of cases was incorrect and should be overruled. The Court firmly rejected both contentions and described the *California* line of cases as having held that,

> as a matter of "purely legal principle ... the Constitution ... allocated to the federal government jurisdiction over foreign

---

**3.** *United States v. Texas,* 339 U.S. at 719, 70 S.Ct. at 924, also controls a claim of title separate from one of sovereignty. The Court said

that in these instances "... property rights are so subordinated to the rights of sovereignty as to follow sovereignty."

commerce, foreign affairs and national defense" and that "it necessarily follows, as a matter of constitutional law, that as attributes of these external sovereign powers the federal government has paramount rights in the marginal sea."

*United States v. Maine,* 420 U.S. at 522–23, 95 S.Ct. at 1159–60. If, as a matter of constitutional law, the federal government must be possessed of paramount rights in offshore waters, it makes no difference whether the competing domestic claimant is a state or a tribe of American natives. All are subordinate to the federal government, and neither can, under the Constitution, claim rights which are at odds with those which are of necessity entrusted to the one external sovereign recognized by the Constitution. *United States v. Wheeler,* 435 U.S. 313, 323, 326, 98 S.Ct. 1079, 1086, 1087, 55 L.Ed.2d 303 (1978). (Indian tribes are "dependent . . . within our territorial jurisdiction" and have no **"freedom to determine external relations."**)

Moreover, the federal government has consistently exercised exclusive jurisdiction and control over the adjacent waters and the seabed on the continental shelf. In the exercise of this jurisdiction, Congress has on occasion enacted statutory provisions permitting certain rights of subsistence for natives. *See e.g.,* Fishery Conservation and Management Act of 1976, 16 U.S.C. §§ 1801–1882 (Indian treaty fishing rights given special recognition). Marine Mammal Protection Act, 16 U.S.C. § 1371(b) (Explicit exemption for native subsistence whaling). The necessary implication is that Congress intended to permit use by Alaska natives of subsistence rights only to the extent authorized. Hence, federal recognition of any sovereign power or property right arising out of subsistence activities would be both inconsistent and illogical. Other federal legislation also reflects the complete and exclusive power of the federal government in the adjacent waters and in the seabed on the continental shelf. *See e.g.,* Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–43 (1953); Submerged Lands Act, 43 U.S.C. §§ 1301–15 (1953).

I conclude as well that the Inupiat people could not have acquired rights to the sea surface, water column and bed in the disputed area prior to 1867 when the United States purchased the area from Russia for, as the Supreme Court noted in *United States v. California,* as late as 1876 the concept of territorial sovereignty over adjacent seas remained doubtful under international law. 332 U.S. at 31–33, 67 S.Ct. at 1664–65. Nor could the Inupiat have acquired those rights after 1867 because once a tribe of American natives is brought within the jurisdiction of the federal government, it loses all elements of external sovereignty including the capacity to acquire sovereignty over or ownership of unclaimed lands. *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493, *rehearing denied,* 452 U.S. 911, 101 S.Ct. 3042, 69 L.Ed.2d 414 (1981); *United States v. Wheeler,* 435 U.S. 313, 323, 326, 98 S.Ct. 1079, 1086, 1087, 55 L.Ed.2d 303 (1978); *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1832); *Johnson v. McIntosh,* 21 U.S. (8 Wheat) 543, 572–73, 5 L.Ed. 681 (1923).

Much of the Inupiat's claim to the Beaufort and Chukchi Seas off-shore areas is based on notions of tribal sovereignty. The Inupiat constantly reiterate that they have never been conquered, have never voluntarily submitted to the jurisdiction of the United States, and have at every opportunity resisted federal and state regulation of their hunting, fishing, whaling, and sealing rights. In effect, the Inupiat claim that they have all the rights of self-determination and sovereignty of an independent nation. These assertions sweep far too broadly.

 Tribes of American natives, especially those living on reservations, do possess some powers of self-determination and sovereignty over their territory. *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980). These powers are especially strong when they relate to the internal sovereignty of the tribe and its rights to self-government and management of the

affairs of its members. *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 173, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973); *United States v. Kagama,* 118 U.S. 375, 381–82, 6 S.Ct. 1109, 1112–13, 30 L.Ed. 228 (1886). The external sovereignty of the tribes, however, is sharply limited by their dependent status. *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 208–09, 98 S.Ct. 1011, 1020–21, 55 L.Ed.2d 209 (1978). In areas where the security of the United States as a nation and its dealings with foreign countries are a major concern, the intrinsic authority of the tribes is revoked by implication. *Id.* at 209–10, 98 S.Ct. at 1021–22. The Supreme Court has repeatedly noted the dominant interests of the national sovereign in the outer continental shelf. *United States v. Maine,* 420 U.S. 515, 521, 95 S.Ct. 1155, 1158, 43 L.Ed.2d 363 (1975); *United States v. Texas,* 339 U.S. 707, 719, 70 S.Ct. 918, 924, 94 L.Ed. 1221 (1950). Any exercise of external sovereignty by the Inupiat in the area of the outer continental shelf would be inconsistent with their status as members of the United States and hostile to the interests of the nation as a whole.

■■ The Inupiat also plead their title and sovereignty claims in terms which assert the violation of a trust relationship which they contend exists between themselves and the federal government. Complaint ¶ 35. This claim also fails. Unless Indian money or property is involved, a trust relationship can only arise from a legislative enactment, a treaty, or executive order. *North Slope Borough v. Andrus,* 642 F.2d 589, 612 (D.C.Cir.1980); *Navajo Tribe of Indians v. United States,* 624 F.2d 981, 988 (Ct.Cl.1980). ("[I]f no tribal money or property is involved and the question is, for instance, whether the United States has a general fiduciary obligation to educate Indians, then existence of the special relationship for that purpose depends upon the proper interpretation of the terms of some document. (e.g. statute, treaty,· executive order).") *No Oilport! v. Carter,* 520 F.Supp. 334, 373 (W.D.Wash.1981) ("A generalized trust responsibility does not exist in the abstract, but rather only arises from a stat-

ute, treaty, or executive order.") *Cape Fox Corporation v. United States,* 456 F.Supp. 784 (D.Alaska 1978). No such language has been brought to the attention of this court. Since I have found that the Inupiat have no property rights in the area claimed and no treaty, statute or executive order has been offered to support the claim of a trust relationship, I conclude that the Inupiat's claim of trust relationship is without foundation.

■ Moreover, I find that this claim is collaterally estopped by the court's finding in *North Slope Borough v. Andrus,* 642 F.2d at 611–12, because the claim that the plaintiffs make here is essentially identical to the one asserted there, and the plaintiffs, while not the same, are so closely aligned as to be "virtual representatives" of each other. *United States v. Rayonier, Inc.,* 627 F.2d 996, 1003 (9th Cir. 1980) (and cases cited therein.)

■ Finally, I conclude that the Inupiat's religious claim is also without foundation. It meets neither of the two elements of the test set by *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). First, the action of the federal government in initially leasing in the Beaufort and Chukchi Seas beyond the three mile limit does not create a serious obstacle to the exercise of the plaintiff's religion. While the Inupiat allege that the government's actions threaten to deny them access to sacred sites, those they identify are located on land, well outside the area at issue in this suit. They offer no explanation of the religious significance of even those sites, *see Sequoyah v. TVA,* 620 F.2d 1159, 1163 (6th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980), and they offer no explanation of how the defendants' activities may interfere with their free exercise of religion. *See Badoni v. Higginson,* 638 F.2d 172, 180 (10th Cir. 1980), *cert. denied,* 452 U.S. 954, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981). They also allege possible disruption of appeasement ceremonies, again without definition.

In essence, the Inupiats claim that their religious beliefs are inextricably inter-

twined with their hunting and gathering life-style, and since all exploratory activities negatively affect some portion of their subsistence area, all such activity should be interdicted on free-exercise grounds. Carried to its ultimate, their contention would result in the creation of a vast religious sanctuary over the Arctic seas beyond the state's territorial waters. A claim to such a large area based on such non-specific grounds cannot provide the sort of "serious obstacle" contemplated by *Yoder.* *Cf. Sequoyah v. TVA,* 620 F.2d at 1164–65.[4]

The Inupiat's claim also fails to meet the second requirement of *Yoder.* The government's interest in pursuing the development of the area outweighs the alleged interference with the plaintiffs' religious beliefs. The federal government has a significant economic stake in the development of energy resources within its borders. *Conservation Law Foundation, et al. v. Andrus, et al.,* 617 F.2d 296, 298 (1st Cir. 1980); *North Slope Borough v. Andrus,* 642 F.2d 589, 591, 593 (D.C.Cir.1980). Perhaps more importantly, the United States has treaty obligations to keep the high seas freely available for international passage and fishing. Convention on the Continental Shelf, *done,* Apr. 29, 1958, 15 U.S.T. 471, T.I.A.S. No. 5578, Article 3; Convention on the High Seas, *done,* Apr. 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200, Articles 1 & 2. Against these specific needs and obligations, I find that the generalized claims of the Inupiat are not adequate to strike the balance in their favor. *Cf. Badoni v. Higginson,* 638 F.2d at 177–79 (Impoundment behind dam flooded several Navajo gods and denied access to specific sacred prayer place. Government also gave tourists access to prayer spot with resulting desecrations. Summary dismissal of Indian claims affirmed because government's decision to build dam and fill impoundment vital to multistate water-storage and power generation project.)

Finally, I observe that the relief sought by the Inupiat creates serious Establish-ment Clause problems. The Supreme Court has held repeatedly that the First Amendment may not be asserted to deprive the public of its normal use of an area. *E.g., Shuttlesworth v. Birmingham,* 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969); *Food Employees Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 320, 88 S.Ct. 1601, 1609, 20 L.Ed.2d 603 (1968); *Cox v. Louisiana,* 379 U.S. 536, 554–55, 85 S.Ct. 453, 464–65, 13 L.Ed.2d 471 (1965); *Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951). I deal in this suit with the high seas, an area which is public to the world under American law. Convention on the Continental Shelf, *supra;* Convention on the High Seas, *supra.* I therefore hold with other courts that a free-exercise claim cannot be pushed to the point of awarding exclusive rights to a public area. *Badoni v. Higginson,* 638 F.2d at 178–79; *Hopi Indian Tribe v. Block,* No. 81–0481, 81 I.L.R. 3073 (D.D.C. June 12, 1981).

For the several reasons stated above, I conclude that the defendants are entitled to judgment against all claims made by the plaintiffs.

---

4. The Cherokee nation sought to prevent flooding of sacred sites and burial grounds in original tribal homelands in impoundment behind Tellico Dam. Held not a serious obstacle since tribe made no showing of central significance of these sites and this valley to the religious life of the tribe.