**UNITED STATES of America,**
**Appellant,**

v.

**William MEANS, Mathew King, a/k/a Noble Redman, Charles Abourezk, Russell Means and all other persons occupying the location called "Yellow Thunder Camp" at Victoria Lake in the Black Hills National Forest, Appellees.**

**William A. MEANS, Gregory F. Zephier, Ron Two Bulls, Russell Means for Yellow Thunder Camp and the Lakota Nation, Appellees,**

v.

**James MATHERS, Forest Supervisor, United States Forest Service; Craig Rupp, Regional Forest Supervisor, United States Forest Service; R. Max Peterson, Chief, United States Forest Service; Richard Lyng, Secretary of Agriculture, Appellants.**

No. 87–5118.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 2, 1987.

Decided Sept. 28, 1988.

Rehearing and Rehearing En Banc Denied
Dec. 13, 1988.

Raymond B. Ludwiszewski, Washington, D.C., for appellant.

Larry B. Leventhal, Minneapolis, Minn., for appellees.

Before BOWMAN, Circuit Judge, ROSS, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

BOWMAN, Circuit Judge.

The United States appeals from a final judgment of the District Court ordering the Forest Service to grant a special use permit to a group of Sioux Indians for use of 800 acres of the Black Hills National Forest as a religious, cultural, and educational community. The Government contends that the District Court erred in ruling that the Forest Service violated appellees' First Amendment right to the free exercise of their religion by denying them a special use permit, and in ruling that the denial of the special use permit was arbitrary and capricious within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). We reverse.

## I.

A band of Sioux Indians left Pine Ridge Reservation on April 4, 1981, to set up a permanent camp in the Black Hills National Forest, where they established, without notice to the Forest Service, a community called Yellow Thunder Camp (YTC). On April 22, 1981, YTC applied for a special use permit for a "religious, cultural, and educational community" on 800 acres of the National Forest. The Forest Service denied the application on August 24, 1981, and ordered the individuals occupying the YTC site to leave by September 8, 1981. A timely administrative appeal was taken.

On September 9, 1981, the United States filed an action against the named principals of YTC seeking to eject them from the 800-acre site. In turn, on September 15, the YTC principals brought a separate action against officials of the Forest Service, claiming authority to occupy the site and further claiming that the named defendants had acted unlawfully in denying YTC a special use permit. The complaint prayed for declaratory and injunctive relief. On December 7, 1981, the District Court consolidated both actions for trial. Meanwhile, on October 7, YTC was notified that the administrative appeal taken from the denial of the special use permit would be stayed because of the pending litigation.[1] By stipulation, the United States agreed not to take forcible action to terminate YTC without first securing a court order.

Trial commenced on November 22, 1982, and proceeded until the conclusion of the Government's case two weeks later. At that point, the trial proceedings were recessed pending the outcome of an appeal from the District Court's order directing the United States Marshals Service to pay witness fees and costs of Yellow Thunder Camp's witnesses. A panel of this Court affirmed that order. *United States Marshals Service v. Means*, 724 F.2d 642 (8th Cir.1983). The Marshals Service's motion for rehearing *en banc* was granted and on August 14, 1984, we concluded "that the district court may order government advancement of such fees and expenses." *United States Marshals Service v. Means*, 741 F.2d 1053, 1055 (8th Cir.1984) (en banc).

Trial reconvened, and on December 9, 1985, the District Court issued its first opinion in the case, *United States v. Means*, 627 F.Supp. 247 (D.S.D.1985) (*"Means I"*). The court held that: (1) the laws, regulations, and policies of the Forest Service burden the free exercise of the Lakota religion in the Black Hills and thus violate the First Amendment; (2) the denial of the special use permit was arbitrary and capricious; and (3) Means and others were entitled to a special use permit to allow them to establish a religious camp at the YTC site. The District Court further announced that its ruling was not to be considered a "final decision" for the purposes

---

1. Means moved for a preliminary injunction requiring the Forest Service to keep its administrative appeal procedure available. The District Court adopted the Forest Service's position that

36 C.F.R. § 211.18(b)(3) precludes administrative appeal of issues being litigated in federal district court, and therefore denied the motion.

of 28 U.S.C. § 1291, and thus was not appealable. *Id.* at 271. To insure that the permit would be granted, the court retained jurisdiction over the proceedings and directed the parties to work out the specifics of relief within a time frame established by the court. *Id.* at 272.

In January 1986, YTC submitted a proposal pursuant to the court's order.[2] The Forest Service treated the submission as a new special use application and formally denied the proposal. The court then issued its final order, *United States v. Means*, Nos. 81–5131 and 81–5135 (D.S.D. Jan. 12, 1987) ("*Means II*"). Incorporating by reference its previous ruling in *Means I*, the District Court set aside the denial of the special use permit and directed the Forest Service to issue a permit "in conformance with this Order," authorizing Means and others to construct a camp at the 800–acre YTC site. *Id.* at 24–25. The court denied the Forest Service's motion for a declaration that the YTC principals were illegally occupying federal land and enjoined it from "in any manner barring or impeding Means and others in this endeavor." *Id.* at 25.

## II.

■ The Government contends that the District Court's ruling is based on a misreading of the First Amendment. It argues that the Forest Service's denial of the YTC special use permit does not burden appellees' right to the free exercise of their religion. Our review of this constitutional question is plenary. *See Hill v. Blackwell*, 774 F.2d 338, 343 (8th Cir.1985).

Religious freedom is guaranteed by the Free Exercise Clause of the First Amendment, which states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; ...." U.S. Const. amend. I. The Su-

preme Court has crafted a sequential analysis for scrutinizing claims arising under the Free Exercise Clause. In this analysis, the preliminary inquiry is whether the challenged governmental action does in fact create a burden on the exercise of the claimant's religion. *See United States v. Lee*, 455 U.S. 252, 256–57, 102 S.Ct. 1051, 1054–55, 71 L.Ed.2d 127 (1982). If such a burden is established, it becomes necessary to consider the nature of the burden,[3] the significance of the governmental interest at stake, and the degree to which that interest would be impaired by an accommodation for the religious practice. *Compare Bowen v. Roy*, 476 U.S. 693, 707–08, 106 S.Ct. 2147, 2156, 90 L.Ed.2d 735 (1986) ("Absent proof of an intent to discriminate against particular religious beliefs or against religion in general, the Government meets its burden when it demonstrates that a challenged requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interest.") *with Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest.").

We conclude that appellees have not satisfied the first prong of this test—the demonstration of a burden on the exercise of religion. "The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion." *Roy*, 476 U.S. at 700, 106 S.Ct. at 2152. The Forest Service has performed no act of compulsion to interfere with appellees' ceremonies or practices, nor has it denied them access to the YTC site for religious

---

**2.** The proposal sought a special use permit for a community consisting of 27 permanent structures, including a permanently occupied tipi camp, an average of 75 additional seasonal structures, and other necessary support facilities. The site would encompass 800 acres. The proposal contemplated occupancy by 80 to 100 young people and 10 teacher-counselors, this number increasing during the summer months. A sizable additional population was anticipated

for the camp's religious and cultural ceremonies. A Visitor's Information and Control Center would be built at the site.

**3.** The Supreme Court, in *Bowen v. Roy*, 476 U.S. 693, 706–07, 106 S.Ct. 2147, 2156, 90 L.Ed.2d 735 (1986), indicated that "the nature of the burden is relevant to the standard the government must meet to justify the burden."

purposes. On the contrary, the Forest Service decision clearly states that "freedom of access to sites, use and possession of sacred objects, and freedom from interference are and continue to be preserved." [4]

In rejecting a Free Exercise Clause challenge in *Bob Jones University v. United States*, 461 U.S. 574, 603–04, 103 S.Ct. 2017, 2035, 76 L.Ed.2d 157 (1983), the Supreme Court observed that the denial of "tax benefits will inevitably have a substantial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets." The same reasoning applies here. The Government has not coerced appellees into violating their religious beliefs; nor has it compelled them, by threat of sanctions, to refrain from religiously motivated conduct or to engage in conduct that they find objectionable for religious reasons. *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, ⸺ U.S. ⸺, 108 S.Ct. 1319, 1325, 99 L.Ed.2d 534 (1988); *Roy*, 476 U.S. at 703, 106 S.Ct. at 2153–54. It is clear that the Forest Service has not "prohibited" appellees' free exercise rights by denying the YTC special use permit. "The crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'" *Northwest Indian*, 108 S.Ct. at 1326 (quoting *Sherbert v. Verner*, 374 U.S. 398, 412, 83 S.Ct. 1790, 1798, 10 L.Ed.2d 965 (1963) (Douglas, J., concurring)).

This language is particularly relevant here. Appellees seek an affirmative benefit from the Government, the imposition of a "religious servitude" upon 800 acres of a national forest. The Supreme Court, expressing its concerns about imposing such a religious servitude upon public land, noted in *Northwest Indian* that the Indians' religious practices "could easily require *de facto* beneficial ownership of some rather spacious tracts of public property." *Northwest Indian*, 108 S.Ct. at 1326–27. We cannot ignore the reality that denial of such a benefit from the Government is of a "wholly different, less intrusive nature than affirmative compulsion or prohibition, by threat of penal sanctions, for conduct that has religious implications." *Roy*, 476 U.S. at 704, 106 S.Ct. at 2154.

Courts consistently have refused to disturb governmental land management decisions that have been challenged by Native Americans on free exercise grounds.[5] *See, e.g., Northwest Indian*, 108 S.Ct. at 1324–30 (Free Exercise Clause does not prohibit the Government from permitting timber harvesting and road construction in an area used by certain American Indians for religious rituals); *Wilson v. Block*, 708 F.2d 735 (D.C.Cir.1983) (decision to permit private interests to expand and develop government-owned ski area did not violate the First Amendment rights of Navajo and Hopi Indian tribes, who were not denied access to the San Francisco Peaks in the Coconino National Forest or impaired in their ability to gather sacred objects or conduct ceremonies); *Badoni v. Higginson*, 638 F.2d 172 (10th Cir.1980), *cert. denied*, 452 U.S. 954, 101 S.Ct. 3099, 69 L.Ed. 2d 965 (1981) (impounding water to form Lake Powell and allowing tourists to visit the Rainbow Bridge National Monument did not violate the free exercise rights of the Indians residing in the area because they were able to enter the Monument and because the Government had a compelling interest in maintaining the lake's capacity)[6]; *Sequoyah v. Tennessee Valley Auth.*,

---

4. We note that the District Court found, and appellees do not dispute, that the YTC site did not have specific religious significance prior to the time it was selected for the establishment of the new religious community. *Means I*, 627 F.Supp. at 253.

5. Most of the cases involve government development of sacred Indian religious sites. For a general discussion of these cases, *see* Note, *American Indian Sacred Religious Sites and Government Development: A Conventional Analysis in an Unconventional Setting*, 85 Mich. L.Rev. 771 (1987).

6. In *Badoni*, the Tenth Circuit stated that "[i]ssuance of regulations to exclude tourists completely from the [Rainbow Bridge National] Monument for the avowed purpose of aiding plaintiffs' conduct of religious ceremonies would seem a clear violation of the Establishment Clause." *Badoni*, 638 F.2d at 179. With

620 F.2d 1159 (6th Cir.1980) (Cherokee Indians' free exercise rights were not infringed by the flooding of the Tellico Dam on the Little Tennessee River in the absence of evidence of centrality or of indispensability of the particular valley to be flooded to Cherokee religious observances); *Inupiat Community of Arctic Slope v. United States,* 548 F.Supp. 182 (D.Alaska 1982), *aff'd on other grounds,* 746 F.2d 570 (9th Cir.1984), *cert. denied,* 474 U.S. 820, 106 S.Ct. 68, 88 L.Ed.2d 56 (1985) (Inupiat religious claims were found to be without foundation as they offered no explanation of the religious significance of the site or of how the Government's activities might interfere with plaintiffs' free exercise of religion. Further, the Government's interest in pursuing the development of the area outweighed the alleged interference with the plaintiffs' religious beliefs.); *Crow v. Gullet,* 541 F.Supp. 785 (D.S.D.1982) (Indian plaintiffs' free exercise rights were not infringed by state's construction of a paved access road and parking area near ceremonial religious grounds because plaintiffs failed to establish that particular religious practices were impaired by the construction).

As appellees have not demonstrated that the special use permit denial burdened the exercise of their religion, our inquiry is at an end.[7] "Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family." *Roy,* 476 U.S. at 699, 106 S.Ct. at 2152 (emphasis in the original). We hold that the Forest Service did not violate appellees' First Amendment right to the free exercise of their religion when it denied the YTC application for a special use permit.

### III.

■ The Government also contends that the District Court erred in ruling that the Forest Service's denial of the YTC application was "arbitrary and capricious" in violation of the APA. We agree.

Our task is to "render an independent decision on the basis of the same administrative record as that before the district court; the identical standard of review is employed at both levels; and once appealed, the district court decision is accorded no particular deference." *First Nat'l Bank of Fayetteville v. Smith,* 508 F.2d 1371, 1374 (8th Cir.1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975). For purposes of this appeal, the parties agree that the standard of review is whether the agency's action was "arbitrary and capricious."[8] *See Citizens to Preserve Overton*

---

such regulations, "the Monument would become a government-managed religious shrine." *Id.* Query whether granting a special use permit for the construction of a permanent religious community on 800 acres of public land would raise similar issues of government aid to religion in violation of the Establishment Clause.

7. Thus we do not reach the question whether any burden on appellees' religious freedom is outweighed by the public interest in maintaining public lands *qua* public lands. We note, however, that Congress has directed the Secretary of Agriculture to administer the national forests for "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. In addition, the Secretary must "develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and *services obtained therefrom.*" 16 U.S.C. § 529. In this case, the Forest Service determined that to grant the YTC permit would be inconsistent with the public interest in main-

taining the integrity of the Black Hills National Forest as public land. We find ample evidence in the record to support that determination.

8. Although at least one court has held that the decision by a forest supervisor that an applicant was unqualified to receive a special use permit was "committed to agency discretion by law and that federal courts have no jurisdiction to review such a decision," *Ness Inv. Corp. v. United States Dep't of Agric., Forest Serv.,* 512 F.2d 706, 716 (9th Cir.1975), we believe that the agency action in this case is not within the class of unreviewable actions committed to agency discretion. The "exception for discretionary action is a very narrow one, applicable only in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Sabin v. Butz,* 515 F.2d 1061, 1065 (10th Cir.1975). Here, 16 U.S.C. § 497 authorizes the Secretary of Agriculture to issue permits for the use of land in the National Forests. In addition to specifically limiting the scope and duration of such permits, the statute expressly

*Park, Inc. v. Volpe,* 401 U.S. 402, 410–15, 91 S.Ct. 814, 820–23, 28 L.Ed.2d 136 (1971).

We note initially that the "ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824. Thus, "[a]gency action is arbitrary and capricious only where it is not supportable on any rational basis." *Brotherhood of Ry. and Airline Clerks v. Burlington N. Inc.,* 722 F.2d 380, 381 (8th Cir.1983). We conclude that the Forest Service's denial of the special use permit here at issue was not arbitrary and capricious.

The Forest Service provided some fourteen supporting reasons for its denial of the YTC application. Several of these reasons pertain to limitations on the agency's statutory authority. For example, under 36 C.F.R. § 251.53(d), promulgated under the authority of 16 U.S.C. § 497, the Forest Service may grant permits for "not over 80 acres" and "not over 30 years." Thus, it was without authority to grant YTC's request for an 800–acre permanent camp.[9] Agency regulations also require that an applicant for a special use permit produce evidence that it has, or *prior* to commencement of construction will have, the technical and financial capability to construct, operate, and maintain the project. 36 C.F.R. § 251.54(e)(2). This appellees did not do. The District Court acknowledged that

"there was little or no possibility of their ever, *before the fact,* satisfying the Forest Service in relation to their environmental impact, financial backing and other technical impediments." *Means II,* slip op. at 16 (emphasis in the original).

Several of the agency's reasons for denying the special use permit are based upon YTC's potentially adverse impact on other interests in the area. The Forest Service concluded that a residential community would not comport with the requirements of the Multiple Use and Sustained Yield Act, 16 U.S.C. § 528, *et seq.* The District Court's finding that "[t]he evidence submitted at trial shows that a camp with 83 buildings is not practical or feasible," *Means I,* 627 F.Supp. at 270, supports the agency's conclusion.

The District Court supported its decision that the permit denial was arbitrary and capricious by a finding that Forest Service policies as implemented "have the effect of discriminating against Indians who are trying to practice their religion." *Id.* at 269. "[T]he policy of the Forest Service as implemented ... is that Indians do not get use permits." *Id.* at 267. In reaching this conclusion, the court relied upon a list of use permit applications for the previous five and one-half years. Of the sixty-one applications received by the Forest Service, fifty-eight were granted; three were denied. The three denied were submitted by

provides that the Secretary's authority "shall be exercised in such manner as not to preclude the general public from full enjoyment of the natural, scenic, recreational, and other aspects of the national forests." Additional and more specific regulations governing the issuance of term special use permits have been promulgated. *See* 36 C.F.R. §§ 251.50 et seq. Though the Secretary has broad discretion to grant or deny special use permits, there is some law to apply. Hence, we conclude that the agency decision presently before us is judicially reviewable.

**9.** Appellees argue, and the District Court was persuaded, that the Forest Service has been inconsistent in the application of the size and duration requirements of 36 C.F.R. § 251.53(d). Appellees contend that special use permits regularly exceed both the 80–acre and 30–year limits. They refer to utility and grazing permits and discuss the numerous ski developments that

exist in national forests. However, these contentions fail to take into account the fact that such permits are qualitatively very different from the permit sought for YTC.

In fact, appellees have not provided any evidence of even a single existing special use permit that authorizes a use even remotely similar in kind or dimension to that requested in the YTC application. The closest thing to it apparently is a United Church of Christ Camp special use permit. However, that campsite covers only twelve acres; has between five and eighteen buildings; and has only a single year-round resident, a caretaker. It is well within the acreage requirements of § 251.53(d). Further, the facility has been in continuous existence since 1921 and was "grandfathered in" to the present regulatory scheme. Moreover, though this permit is renewed periodically, it "would not be approved if originally applied for now." *Means I,* 627 F.Supp. at 267.

Indians, while non-Indians tendered the fifty-eight approved.[10]

We believe the District Court's reliance on this raw data was misplaced. "[S]tatistics are not irrefutable.... [T]heir usefulness depends on all of the surrounding facts and circumstances." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed. 2d 396 (1977). A careful review of the record reveals that, although the District Court failed to inquire into the contents of the approved applications or the Forest Service's reasons for approving them, there is evidence that the denial of the three applications submitted by Indians was based in each instance upon rational grounds, grounds which refute the charge of discrimination. For example, the Forest Service denied one Indian applicant a permit for his chosen site on the basis of an adverse environmental assessment. However, it simultaneously offered him a permit for an alternate site, which he rejected. Trial Transcript, Volume V at 156–60.[11] In view of this evidence, and because the record provides no basis for comparing the permits granted with the permits denied, we conclude that the history of permit applications as shown by the record simply does not support a finding that Forest Service policies are "skewed such that [they] discriminate[ ] against Indians." *Means I*, 627 F.Supp. at 269.[12]

The District Court also relied on the testimony of James Mathers, Forest Supervisor (now retired), Black Hills National Forest, and concludes that he was "subconsciously biased against Indian applicants." *Id.* We cannot find objective evidence in the record to support the court's conclu-

sion. Indeed, the record better supports the District Court's parallel finding that "Mr. Mathers is biased in favor of the Forest Service's multiple use policy and this bias causes him to reject other uses out of hand as soon as he sees they are not consistent with the multiple use policy." *Id.* The court failed to note that the multiple use policy is mandated by Congress, and did not offer any reason why it is improper for an official of the Forest Service to be "biased" in favor of the national policy Congress has established. *See* 16 U.S.C. § 528, *et seq.*

Based on our review of the record, we are firmly convinced that the District Court's finding that the denial of YTC's application was a product of discrimination against Indians is not supported by the evidence and is clearly erroneous. *See* Fed.R.Civ.P. 52; *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–81, 105 S.Ct. 1504, 1511–15, 84 L.Ed.2d 518 (1985). *See also City of Rome v. United States*, 446 U.S. 156, 183–87, 100 S.Ct. 1548, 1564–66, 64 L.Ed.2d 119 (1980). To the contrary, it is abundantly clear that the Forest Service, under its present policies, would have denied an application from any person or group for a special use permit of the scope and duration of the one that YTC sought here.

Having carefully reviewed the record in light of the applicable law, we hold that the agency's denial of YTC's application for a special use permit is supported by substantial evidence in the record as a whole and was not arbitrary and capricious.

## IV.

Because of our holdings in Parts II and III of this opinion, it necessarily follows

---

**10.** This list apparently was derived from a Government interrogatory response. Trial Transcript, Volume V at 185. However, it was adduced at trial that the Forest Service had denied more than three special use permit applications (the exact number is not clear), and that at least two of the applications denied had been submitted by non-Indians. Trial Transcript, Volume I at 93–97 and Volume XIX at 151–53, 163.

**11.** The Forest Service denied the second Indian application in part because the proposed site was in a flood plain. Trial Transcript, Volume I

at 91 and Volume XIX at 154. The third denial in question is the denial of the YTC application, which is, of course, the subject matter of this appeal.

**12.** The District Court also refers to the United Church of Christ Camp permit as evidence of the Forest Service's discriminatory policy. However, that permit bears little resemblance to the permit requested in the YTC application, represents a "grandfathering in" of a long-existing facility, and would not be granted if initially sought today. *See supra* note 10.

that the District Court erred when it established the parameters of a YTC special use permit and ordered that such a permit issue. The Forest Service's denial of the special use permit was lawful, and the District Court therefore had no authority to set aside the agency's decision. We thus need not reach the issues the Forest Service has raised concerning the remedial authority of the federal courts when an agency decision is found to be unlawful.

## V.

To summarize, we hold that the Forest Service did not violate appellees' First Amendment right to the free exercise of religion by denying their application for a special use permit, and that the denial was not arbitrary and capricious. The District Court therefore had no authority to direct the issuance of a special use permit. Accordingly, the decision of the District Court is reversed.[13]

13. Nothing in our decision precludes appellees from applying to the Forest Service for a special use permit drawn in more reasonable terms and in conformity with the statutory limits on acreage and duration.